## HAMMOND–KNOWLTON v. UNITED STATES.

### No. 302.

Circuit Court of Appeals, Second Circuit.

June 24, 1941.

See, also, 26 F.Supp. 292.

Eugene D. Alexander, of New York City, and Edward K. Nicholson, of Bridgeport, Conn., for plaintiff-appellee.

Samuel O. Clark, Jr., Asst. Atty Gen., Sewall Key and Samuel H. Levy, Sp. Assts. to Atty. Gen., and Robert P. Butler, U. S. Atty., and Valentine J. Sacco, Asst. U. S. Atty., both of Hartford, Conn., for defendant-appellant.

Before SWAN, CHASE, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

This is an appeal from a judgment of the District Court holding that appellee was entitled to recover for the overpayment of taxes. The facts are set out in our opinion on a prior appeal, Hammond-Knowlton v. Hartford Connecticut Trust Co., 2 Cir., 89 F.2d 175 certiorari denied 302 U.S. 707, 58 S.Ct. 27, 82 L.Ed. 546, and need be only briefly restated here. Charles C. Knowlton died October 12, 1924. Appellee, his administratrix, filed a federal

estate tax return the following year, showing a tax of $79,686.06, against which she claimed a credit of 25% (which was the maximum allowable) for estimated state inheritance taxes. She paid the difference on or before October 10, 1925. The Commissioner of Internal Revenue made a final audit of the estate, and reported on October 21, 1926, an increase in the value of certain securities. Since the rate of tax was reduced by section 322(a) of the Revenue Act of 1926, 26 U.S.C.A. Int.Rev. Acts, page 261, however, the tax was determined as $609.04 less than the amount paid. The amount of $59,155.51 thus shown to be due, was before deduction of a credit for state inheritance taxes. On April 12, 1927, the estate paid to the State of Connecticut the sum of $73,372.21, the amount certified by the probate judge as due for state inheritance taxes. On October 16, 1931, taxpayer filed with the Commissioner a document labelled "Supplemental data on audit of return—Evidence for credit and refund", claiming a refund for the payment of state taxes. The Commissioner treated this as a claim for refund, and rejected it because not filed within four years after payment of the tax sought to be recovered. In 1933 the taxpayer sued the Collector of Internal Revenue in the District Court and won. On the prior appeal, without finally passing on the timeliness of the refund claim, in an opinion by Judge Manton, we sustained the contention (not made in the District Court and first made in this court [1], after the statute of limitations had barred any new suit against the United States) that suit against the Collector could not be maintained because the alleged overpayment resulted from the action of the Commissioner in disallowing a credit claimed by the taxpayer, rather than from the wrongful collection of the tax by the Collector. We reversed the District Court on that issue, and remanded the case for a new trial. The District Court, thereupon, in 1938, permitted appellee to amend her complaint, nunc pro tunc, to substitute the United States as defendant in place of the executor of the Collector, and to reduce her original claim of $15,397.92 to $10,000, the jurisdictional limit of the District Court under the Tucker Act, 28 U.S.C.A. § 41(20), although, at the date of the filing of the amendment, the statute of limitations barred the bringing of an original suit against the United States. The District Court then found that a claim for refund had been filed within the four-year limit imposed by sections 3226 and 3228 of the Revised Statutes, 26 U.S.C.A. Int.Rev. Code, §§ 3313, 3772 (on the ground that that period began when the final payment of state inheritance taxes was made on October 16, 1930), and that taxpayer, being entitled to a credit which the Commissioner had wrongfully disallowed, should recover. On this second appeal, the United States questions the order allowing the amendment, after the running of the statute of limitations, of appellee's complaint so as to substitute it as defendant in place of the Collector, and the claim to $10,000. Appellant also reducing asserts that the claim for refund was filed too late. These are the only issues in the case; there appears to be no doubt that, aside from these obstacles, taxpayer is entitled to a refund. We first consider appellant's contention that the District Court erred in permitting appellee's amendment to be filed in 1938.

Appellee, when she began her suit in 1933, was not unreasonable in believing that on the basis of Moore Ice Cream Co. v. Rose, 289 U.S. 373, 53 S.Ct. 620, 77 L. Ed. 1265, 1932, she could, without amendment, maintain her action against the Collector, for, on the same basis, on similar facts, the Court of Appeals for the Fourth Circuit later reached that same conclusion in United States v. Piedmont Mfg. Co., 89 F.2d 296, 298, 1937.[2] But the subsequent decision, in 1938, in Lowe Bros. v. United States, 304 U.S. 302, 305, 58 S. Ct. 896, 82 L.Ed. 1362 (which inferentially overruled the Piedmont case) makes it clear that our decision on the prior appeal was correct, i.e., that appellee could not have recovered against the Collector. The question, then, is whether the amendment, substituting the United States as defendant, "related back" so as to prevent the running of the statute of limitations.

If the suit were between private persons, it might well be regarded as having originally been brought against a defendant, sued in the wrong capacity, so as not to preclude an amendment, rectifying that error, filed after the statute had run.

[1] A point noted by appellee in her petition for rehearing on the former appeal.

[2] The Court there said that "an overpayment in cash cannot be realistically distinguished from an overpayment by credit in determining the liability of the Collector."

Missouri, Kansas & Texas R. Co. v. Wulf, 226 U.S. 570, 33 S.Ct. 135, 57 L.Ed. 355, Ann.Cas. 1914B, 134. On that analogy, were this a case of first impression, we would incline to hold that appellee's amendment effectually related back.

We are, however, here confronted with two barriers to such a conclusion: First, in the suit as originally begun, service was not formally had upon the United States, as defendant. Second, the amount for which plaintiff originally sued was in excess of the amount of $10,000, for which suit can be maintained against the United States in the federal District Court. In dealing with cases involving either of these factors, the decisions of the Supreme Court have, at times, been ungenerous to the citizen; in such cases the attitude is that the United States, as sovereign, being immune from suit, except with its consent, the courts must insist that, when it gives such consent, attaching conditions thereto, it is fatal not to comply literally with those conditions. True, the Supreme Court indicated strongly in Moore Ice Cream Co. v. Rose, 289 U.S. 373, 53 S.Ct. 620, 77 L.Ed. 1265, 1933, that such strictness was to be relaxed. But the lower courts have been admonished not to enlarge too widely upon the implications of that case.[3] We, therefore, conclude, reluctantly, that, if appellee is to be successful, it must be by direction of the Supreme Court and not by ours. Because the matter is of general importance and not entirely free of doubt, we feel it appropriate to set forth in some detail the bases of our conclusion:

As above noted, the first obstacle to appellee's success is the fact that her suit, as originally begun, was not against the United States but against the Collector. The government asserts the doctrine that such a suit is "personal" to the Collector, and is not against the United States. The historic purpose of that doctrine, devised by the courts, was to do justice to taxpayers who, at one time, could not directly sue the government to recover wrongful exactions by its officers. A review of that doctrine's history is instructive:

Early in American jurisprudence, cases arose where a citizen sued an officer of the State or of the United States, alleging that the defendant, acting pursuant to an unconstitutional statute, had invaded or threatened to invade the citizen's individual legal rights, as, for instance, through seizure, by a distress warrant, of his personal property to collect a tax, or by the taking of his land, or the like. On the facts, it appeared that the government would benefit from the officer's conduct; therefore, had the defendant been the officer of a private corporation, the suit could have been brought against it as the real party in interest. There was the rub; the government could not be sued without its consent, and it had withheld its consent.[4] At first blush, that absence of consent seemed to be an impassable barrier to any such action. That obstacle, however, was easily and frequently surmounted by a doctrine plainly devised to avoid injustice to the citizen: The Supreme Court repeatedly held that, if the government officer's conduct, regarding him as a private citizen, would constitute an invasion of the citizen's individual legal rights, then the action would be considered as one brought against the defendant not as an officer but as a private person; if, then, he could show that he was acting in accordance with a valid statute, the suit was at an end because it was a suit against a non-consenting government and must fail; but, if he could not prove that he was acting pursuant to a valid statute, then it was held that he had no defense and must answer personally for his misconduct as an individual, notwithstanding that the government was, in fact, the real party in interest. See e.g. Cunningham v. Macon & Brunswick R. Co., 109 U.S. 446, 456, 3 S.Ct. 292, 27 L.Ed. 992; Poindexter v. Greenhow, 114 U.S. 270, 287, 5 S.Ct. 903, 962, 29 L.Ed. 185; United States v. Lee, 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171; In re Ayers, 123 U.S. 443, 500, 8 S.Ct. 164, 31 L.Ed. 216; Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714, 13 L.R.A.,N.S., 932, 14 Ann.Cas. 764; Hopkins v. Clemson Agricultural College, 221 U.S. 636, 644, 31 S.Ct. 654, 55 L.Ed. 890, 35 L.R.A.,N.S., 243; Philadelphia Co. v. Stimson, 223 U.S. 605, 620, 32 S.Ct. 340, 56 L.Ed. 570, 1912; Ex parte La Prade, 289 U.S. 444, 455, 53 S.Ct. 682, 77 L.Ed. 1311, 1933.[5] In Davis

---

[3] Lowe Bros. v. United States, supra; cf. United States v. Piedmont Mfg. Co., supra.

[4] In the case of a State, the 11th Amendment stood in the way, absent the State's consent.

[5] The individual right of the citizen which is invaded must be of "a recognized character"; Perkins v. Lukens Steel Co., 310 U.S. 113, 125, 60 S.Ct. 869, 84 L.Ed. 1108, 1940; but it may be a substantial right created by statute, Amer-

v. Gray, 16 Wall. 203, 220, 21 L.Ed. 447, and United States v. Lee, supra, 106 U.S. at page 215, 1 S.Ct. at page 256, 27 L.Ed. 171, the court said that, in such cases, "making a state officer a party does not make the state a party, *although her law may have prompted his action, and the state may stand behind him as a real party in interest.*" 6

But the Supreme Court has also held that if and when a State or the United States has waived its immunity from suit, then, in such a proceeding against its officer, he will be regarded as a formal party and the government as the real party in interest, with the result that a judgment against the officer will be res judicata in a subsequent suit, involving the same issues, in which

ican School of Magnetic Healing v. McAnnulty, 187 U.S. 94, 23 S.Ct. 33, 47 L.Ed. 90, 1902.

6 If the state is an indispensable party to the relief sought, the suit cannot lie, e.g. if the object of the suit is to compel specific performance of the state's control, or to compel an officer to pay money out of the state treasury, Louisiana v. Jumel, 107 U.S. 711, 2 S.Ct. 128, 27 L.Ed. 448, 1882; Hagood v. Southern, 117 U.S. 52, 6 S.Ct. 608, 29 L.Ed. 805, 1886.

In Cunningham v. Macon & Brunswick R. Co., supra, the court said (109 .U.S. at page 452, 3 S.Ct. at page 297, 27 L. Ed. 992) that, where suit is allowed against an officer, the defendant "is not sued as, or because he is, the officer of the government, but as an individual, and the court is not ousted of jurisdiction because he *asserts* authority as such officer. To make out his defense he must show that his authority was sufficient in law to protect him". In Poindexter v. Greenhow, supra, the court said (114 U. S. at pages 282, 288, 5 S.Ct. at page 910, 29 L.Ed. 185) that the citizen "paid the taxes demanded of him by a lawful tender. The defendant had no authority of law thereafter to attempt to enforce other payment by seizing his property. In doing so he ceased to be an officer of the law, and became a private wrongdoer. It is the simple case in which the defendant, a natural private person, has unlawfully, with force and arms, seized, taken, and detained the personal property of another." He is "sued as a wrongdoer" and, if he cannot "justify by the authority of the state", he "stands * * * stripped of his official character, and, confessing a personal violation of the plaintiff's rights, for which he must personally answer, he is without defense"; for, then, what he has done is "not the * * * deed of the state, but is the mere wrong and trespass of" a person who "falsely [speaks] and [acts] in its name." In the case of In re Ayers, supra [123 U.S. 443, 8 S.Ct. 180, 31 L.Ed. 216], speaking of suits to enjoin threatened action by government officers pursuant to an invalid statute, the court said "the vital principle in all such cases is that the defendants, though professing

to act as officers of the state, are threatening a violation of the personal or property rights of the complainant, for which they are personally and individually liable".

Cf. the related cases where a citizen seeks, by a suit against a government officer, to have the courts determine the constitutionality of a statute (or whether the officer has violated a valid statute); the courts refuse to consider such questions—because there is no "case or controversy"—unless the citizen first shows that, were there no statute involved, the conduct of the officer, regarded as a private person, has invaded or will invade the citizen's individual rights, of a recognized character; in the absence of such a showing there is damnum absque injuria; Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L. Ed. 1078; Stearns v. Wood, 236 U.S. 75, 78, 35 S.Ct. 229, 59 L.Ed. 475; Alabama Power Co. v. Ickes, 302 U.S. 464, 58 S. Ct. 300, 82 L.Ed. 374, 1938; Tennessee Electric Power Co. v. T.V.A., 306 U.S. 118, 137, 59 S.Ct. 366, 83 L.Ed. 543; Duke Power Co. v. Greenwood County, 4 Cir., 91 F.2d 665, 677, 1937, affirmed 302 U.S. 485, 58 S.Ct. 306, 82 L.Ed. 381; Perkins v. Lukens Steel Co., 310 U.S. 113, 125, 129, 60 S.Ct. 869, 84 L.Ed. 1108, 1940; Atlanta v. Ickes, 308 U.S. 517, 60 S.Ct. 170, 84 L.Ed. 440, 1940; cf. concurring opinion in Coleman v. Miller, 307 U.S. 433, 460, 59 S.Ct. 972, 83 L.Ed. 1385, 122 A.L.R. 695, 1939. The key to such decisions is revealed by Muskrat v. United States, 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246, where, by statute, an appeal to the courts was authorized, so that the government's consent to be sued was present, but the court refused to act because there was no "case or controversy".

Of course, the cases here being discussed are of a different character from those brought to compel an official to perform a plain ministerial duty; Board of Liquidation v. McComb, 92 U.S. 531, 541, 23 L.Ed. 623, 1875; or where an officer seeks to enforce a statute or his administrative order purporting to be based thereon, N. L. R. B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S. Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352.

the citizen and the government are both formally made parties. Gunter v. Atlantic Coast Line R. Co., 200 U.S. 273, 284, 285, 26 S.Ct. 252, 50 L.Ed. 477, 1906; cf. Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 403, 60 S.Ct. 907, 84 L.Ed. 1263, 1940. For, in such circumstances, that obstacle discussed in Davis v. Gray, supra, to the use of the "real party in interest" doctrine has disappeared. Accordingly, when consent to be sued has been given, the cases would seem to be pertinent in which it has been held that a person who is not made a defendant of record, even if he is not in privity with a party to the action, may nevertheless subject himself to being concluded by way of res judicata, if openly and actively, in respect to some interest of his own, he actually assumes and manages the defense of the action. Souffront v. La Compagnie des Sucreries De Porto Rico, 217 U.S. 475, 30 S.Ct. 608, 54 L.Ed. 846; Van Kannel Revolving Door Co. v. Winton Hotel Co., D.C., 263 F. 988; Elliott Co. v. Roto Co., 2 Cir., 242 F. 941, 942; 34 C.J. 977, note 60, and 1006, note 83.

But, when, in the early cases, suits were first brought by citizens against Collectors of the United States to recover taxes paid but not due by law, the United States had not consented to be sued for such grievances. Had the Collector levied a distress warrant, such a suit could have been maintained against him for committing, as an individual, an actionable wrong invading the citizen's right, and the Collector, because he collected an unlawful tax, would have been unable to assert as a defense that he was lawfully acting as a government officer pursuant to statute. So, it was held that, where actually or impliedly threatened with such a levy, the citizen, if he paid the exaction under protest, could maintain a suit against the Collector, as an individual, for money wrongfully and involuntarily paid under compulsion, although the Collector had paid the collected funds to the Treasury. Elliot v. Swartwout, 10 Pet. 137, 153, 155, 156, 9 L.Ed. 373, 1836; Story, J. in Cary v. Curtis, 3 How. 236, 254, 11 L.Ed. 576, 1845; Cf. Atchison, etc., R. Co. v. O'Connor, 223 U.S. 280, 287, 32 S.Ct. 216, 56 L.Ed. 436, Ann.Cas.1913C, 1050, 1912. The taxpayer's protest was a warning not to pay to the Treasury the moneys collected. Later statutes made it the duty of the Collector to turn in the moneys to the government, regardless of the protest; there were decisions to the effect that such statutes barred suits against the collector; but subsequent decisions cleared up that doubt. Philadelphia v. The Collector, 5 Wall. 720, 731, 18 L.Ed. 614; Arnson v. Murphy, 109 U.S. 238, 241, 3 S.Ct. 184, 27 L.Ed. 920.

Included in such legislation was a statute, enacted in 1863, 12 Stat. 741, § 12 [7], which provided that, when judgment is procured against "a collector or other officer of the revenue for * * * the recovery of any money exacted by or paid to him and by him paid into the Treasury, in the performance of his official duty, and the court certifies" either (1) "that there was probable cause for the act done by the collector or other officer, or (2) that he acted under the directions of the Secretary of the Treasury, or other proper officer of the Government, no execution shall issue against such collector or other officer, but the amount so recovered shall, upon final judgment, be provided for and paid out of the proper appropriation from the Treasury." In United States v. Sherman, 98 U.S. 565, 25 L.Ed. 235, 1878, (as interpreted in Moore Ice Cream Co. v. Rose, supra) it was held that the effect of the filing of such a certificate is to convert the suit into one against the United States.

Nevertheless, in Sage v. United States, 250 U.S. 33, 39 S.Ct. 415, 416, 63 L.Ed. 828, 1919, it was held that, in a suit against the United States for a tax refund, a judgment for part of the claim, entered in a prior suit against the Collector, raising the same issues, was not res judicata. The court said that, under the statute, "the judgment is to be paid * * * if a certificate is granted by the Court that there was probable cause for his [the Collector's] act". But it said that a suit against a Collector "is personal [in] its incidents", and that "at the time the judgment is entered the United States is a stranger", because, only if the court, after the entry of judgment, finds that there was probable cause, will the certificate be issued. This thesis was explained in Smietanka v. Indiana Steel Co., 257 U.S. 1, 42 S.Ct. 1, 2, 66 L.Ed. 99, 1921; there the tax had been collected by Collector Fitch, but suit for recovery was brought against his successor, Smietanka; the court held that the suit must be dismissed, because not authorized by statute; in that connection the court said: "To show that the action still is personal, as laid

---

[7] Now found, with immaterial verbal changes, in 28 U.S.C.A. § 842.

down in Sage v. United States, 250 U.S. 33, 37, 39 S.Ct. 415, 63 L.Ed. 828, it would seem to be enough to observe that when the suit is begun it cannot be known with certainty that the judgment will be paid out of the Treasury. That depends upon the certificate of the Court in the case. It is not to be supposed that a stranger to an unwarranted transaction is made answerable for it; yet that might be the result of the suit if it could be brought against a successor to the collectorship. A personal execution is denied only when the certificate is given." In Graham & Foster v. Goodcell, 282 U.S. 409, 430, 51 S.Ct. 186, 194, 75 L.Ed. 415, 1931, the court, in passing, rejected an argument that the United States, without substituting another remedy, could enact a valid statute depriving citizens of the right to recover from a Collector monies unlawfully collected by him, saying: "Such an action is personal and not against the United States", citing the Sage and Smietanka cases. In Bankers Pocahontas Coal Co. v. Burnet, 287 U.S. 308, 53 S.Ct. 150, 77 L.Ed. 325, 1932, it was held, on the authority of the Sage and Smietanka cases, supra, that issues determined in a suit against a Collector were not res judicata in a subsequent suit against the Commissioner.

Congress had provided, in 1924, Revenue Act 1924, § 1014, 26 U.S.C.A. Int.Rev. Acts, page 128, that a suit against the Collector for recovery of taxes unlawfully collected might be brought, regardless of whether the tax had been paid under protest, and made that provision retroactive. In Moore Ice Cream Co. v. Rose, 289 U.S. 373, 53 S.Ct. 620, 77 L.Ed. 1265, 1933, no protest had been filed, and the tax had been paid and the Collector had remitted the funds to the Treasury before the 1924 amendment was enacted; the collector, when sued, argued that the suit was personal and that the retroactive provision of that statute infringed his individual rights under the 5th Amendment. Mr. Justice Cardozo, speaking for the Court, rejected that argument, saying (289 U.S. at page 382, 383, 53 S.Ct. at page 623, 77 L.Ed. 1265): "A suit against a collector who has collected a tax in the fulfillment of a ministerial duty is to-day an anomalous relic of bygone modes of thought. He is not suable as a trespasser, nor is he to pay out of his own purse. He is made a defendant because the statute has said for many years that such a remedy shall exist, though he has been guilty of no wrong, and though another is to pay. * * * There may have been utility in such procedural devices in days when the government was not suable as freely as now. * * * They have little utility today, at all events where the complaint against the officer shows upon its face that in the process of collecting he was acting in the line of duty, and that in the line of duty he has turned the money over. In such circumstances his presence as a defendant is merely a remedial expedient for bringing the government into court."[8] In that opinion there was noted an aspect of the statute of 1863 which had apparently been overlooked in the earlier Sage, Smietanka, Goodcell and Bankers Pocahontas cases: The condition of the grant by the trial court of the certificate, making the judgment one against the United States, is, the court pointed out in Moore Ice Cream Co. v. Rose, "either (a) that there was probable cause for the act done by the collector or other officer, or (b) that he acted under the directions of the Secretary of the Treasury or other proper officer of the Government"; the court, after so observing, went on to say that, since, in the case then before it, the complaint showed on its face that the tax had been duly assessed by the Commissioner, "the collector was under a ministerial duty to proceed to collect it", so that "there was nothing left to his discretion. Other duties less definitely prescribed may leave a margin for judgment and for individual initiative. Cf. Agnew v. Haymes, [4 Cir.] 141 F. 631. There was no such margin here. His duty being imperative, he is protected by the command of his superior from liability for trespass * * * and is entitled as of right to a certificate converting the suit against him into one against the government".

Accordingly, it is only in the unusual case—where the Collector is not acting under explicit instructions from his superior officers, i. e. where he had merely "probable cause for acting"—that, prior to the entry of the judgment against him, it cannot be foretold that any such judgment will inevitably be one against the Government; in the usual case, the suit, from its inception, is patently, in substance, a suit for

---

[8] The court also said 289 U.S. at page 383, 53 S.Ct. at page 624, 77 L.Ed. 1265, that the Collector was "a formal party only * * *."

recovery against the United States; in other words, the statement—made in the earlier Sage, Smietanka, Goodcell and Bankers Pocahontas cases—that the suit against the Collector is personal, has apparently, in the light of the Moore Ice Cream case, only a limited meaning, i. e., it relates solely to cases where the Collector, in collecting the tax, was not doing a purely ministerial act pursuant to explicit instructions.[9]

In Tait v. Western Maryland R. Co., 289 U.S. 620, 53 S.Ct. 706, 708, 77 L.Ed. 1405, 1933, it was held that a judgment in a suit between a taxpayer and the United States "or its official agent, the Commissioner," is res judicata in a later suit, involving the same issues, against the Collector; that decision would seem to re-enforce the view that a suit against a Collector is, ordinarily, a suit against the United States. However, in the Tait case, the court said (289 U.S. at page 627, 53 S.Ct. at page 708, 77 L.Ed. 1405): "In a suit for unlawful exaction the liability of a collector is not official but personal. [Citing the Sage, Goodcell and Smietanka cases.] And for this reason a judgment in a suit to which he was a party does not conclude the Commissioner or the United States. [Citing the Bankers Pocahontas case.] We think, however, that where a question has been adjudged as between a taxpayer and the government or its official agent, the Commissioner, the collector being an official inferior in authority, and acting under them, is in such privity with them that he is estopped by the judgment". But the reference to the earlier cases should, it would seem, be read, in the light of Moore Ice Cream Co. v. Rose, as meaning merely that, absent express instructions to the Collector to collect the tax, such a suit against him is personal.

Even assuming that the court in the Tait case meant more, its statement, above quoted,[10] was, at most, dictum. So regarding it, it has been criticized by two of the ablest commentators on tax law [11]; for, it is suggested, if the Collector is an inferior of the United States, so also is the Commissioner; the Collector is no less the government's "official agent" than the Commissioner; he is no less "in privity" with the Commissioner and the United States than they with him; and yet a decision involving the Commissioner furnishes a basis for res judicata in a suit against the United States in the Court of Claims or in the District Court sitting as a Court of Claims; Continental Petroleum Co. v. United States, 10 Cir., 87 F.2d 91, 1936, certiorari denied 300 U.S. 679, 57 S.Ct. 670, 81 L.Ed. 883. In the recent case of Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 60 S.Ct. 907, 84 L. Ed. 1263, 1940, a judgment in an earlier suit against the National Bituminous Coal Commission was held to be res judicata, as to the issues there involved, in a subsequent suit against the Collector, the court holding that there was "privity between officers of the same government", i. e., between the Commissioner and the Collector; but the Collector was obviously not an "inferior" of the National Bituminous Coal Commission. It seems easily possible then, that when the question involved in the Bankers Pocahontas case is again squarely presented, in a case where the Collector acted according to instructions, the Supreme Court will reconsider that decision in the light of the reasoning in the Moore Ice Cream case. To continue to rely on the statement in the Sage case as if it meant that, in *all* suits against a Collector for unlawful exaction, his liability is "personal", is, to say the least, awkward, after the court unequivocally said in Moore Ice Cream Co. v. Rose that in such a suit the Collector's "presence as a defendant is merely a remedial expedient for bringing the government into court", that the Collector is "a formal party only", and that such a suit "is to-day an anomalous relic of bygone modes of thought". It would appear that the reason for the rule has evaporated.

It shocks the conscience that the government of the United States may be able, on the basis of such a vestige or shadow of a shadow of a once virile rule, to defeat the just claim of a citizen. The payment of

---

9 See dissenting opinion of Judge Whitaker in Nunnally Inv. Co. v. United States, Ct.Cl., 36 F.Supp. 332, 333, 340, 341, et seq., 1941, from which this analysis is borrowed.

10 And a similar statement in Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 403, 60 S.Ct. 907, 84 L.Ed. 1263, 1940.

11 Paul, Selected Studies in Taxation, 2d series, 1938, 104, 126; Griswold, Res Judicata in Federal Tax Cases, 46 Yale L.J. (1937) 1320, 1340–1347.

taxes is notoriously irksome, but the reflective citizen is glad to pay taxes lawfully assessed because he knows that such exactions are the necessary cost of a society without which he could not exist. When, however, a sum has been collected unlawfully under the guise of a tax, and its repayment is concededly a matter of both justice and of legal right, to block that repayment, merely because of a rule of law which once had substance but no longer has—merely because, in passing, the Supreme Court has reiterated language which no longer has any substantial meaning—is to provoke justified dissatisfaction with government.

The old fiction that the suit against the Collector is personal was, as we have noted, contrived to do justice to a citizen suing to recover taxes. That fiction is, as Mr. Justice Cardozo recognized, no longer useful. Judge Soper has observed that such a suit "is a kind of John Doe action, allowed in part by statutory implication, in part by statutory direction, which, by an amiable fiction [12] to take the place of formal consent, though in name against the collector, is in substance and effect * * * against the United States".[13] Bentham said of legal fictions that they "are no more necessary to justice than is poison to sustenance * * *. Fictions are falsehoods, and the judge who invents a fiction ought to be sent to jail".[14] Such strictures are surely excessive.[15] Wise students of legal and other types of thinking have demonstrated that fictions are frequently indispensable thought contrivances; they have been called "conceptual shorthand", "short-cuts", "useful lies", "ingenious abbreviations", "psychological pulleys", "figures of thought", "the algebra of the law", "necessary scaffoldings of thought".[16] But those same students agree that a fiction becomes a dangerous instrumentality, if not used with constant lively awareness that it does not correspond to the realities, that it is essentially metaphorical, and that it must not be pressed beyond the point of usefulness. With special reference to legal fictions, it should not be forgotten that the Supreme Court has said that "fictions of law shall not be permitted to work any wrong";[17] that "a fiction * * * is not allowed to obscure the facts, when the facts become important";[18] that "legal fictions have an appropriate place in the administration of the law" but only "when they are required by the demands of convenience and justice";[19] and that "while fictions are sometimes invented to realize the judicial conception of justice" they are to be avoid-

---

[12] Cf. Tyler v. United States, 281 U.S. 497, 503, 50 S.Ct. 356, 74 L.Ed. 991, 69 A.L.R. 758; United States v. Jacobs, 306 U.S. 363, 369, 59 S.Ct. 551, 83 L. Ed. 763.

[13] Anniston Mfg. Co. v. Davis, 5 Cir., 87 F.2d 773, 776, 1937, affirmed 301 U. S. 337, 57 S.Ct. 816, 81 L.Ed. 1143.

[14] Bentham, Works (1843 Ed.) Vol. 6, p. 582; cf. Vol. 2, p. 466, Vol. 7, p. 283.

[15] Bentham, in other writings, showed his appreciation of the value of fictions in certain thought areas; see Ogden's article in Psyche, July 1928, p. 4. But he was apparently unwilling to admit their validity in legal thinking; see Frank, Law and the Modern Mind, 321–322.

Jeremiah Smith joined with Bentham: "The use of fiction", he asserted, "tends not only to impair, in a general way, reverence for truth; but also to diminish the respect which would otherwise be felt for the law itself. * * * We believe that, at the present day, the use of fiction in law should be entirely abandoned. * * * If a legal truth, then its continued use can result only in evil. If, on the other hand, it represents—in part at least—some clumsily concealed legal truth, then it is capable of being translated into the language of truth, and we should adopt Mr. Bentham's remedy— 'Burn the original, and employ the translation in its stead.' In short, we would entirely discard the use of fiction phrases and fiction reasons." Surviving Fictions, 27 Yale L.J. (1917), 147, 154.

[16] See Tourtoulon, Philosophy in the Development of Law, 293–296; 383–399; 644 ff; Vaihinger, The Philosophy of "As If", passim; cf. Cohen, On the Logic of Fictions, 20 The Journal of Philosophy, 477; and see comments on those writings in Frank, Law and the Modern Mind, 37–41; 312–322.

[17] Story, J., in United States v. Nineteen Hundred and Sixty Bags of Coffee, 8 Cranch. 398, 415, 3 L.Ed. 602.

[18] Holmes, J., in Blackstone v. Miller, 188 U.S. 189, 204, 23 S.Ct. 277, 278, 47 L.Ed. 439; cf. Liverpool & London & Globe Ins. Co. v. Board of Assessors for the Parish of Orleans, 221 U.S. 346, 354, 31 S.Ct. 550, 55 L.Ed. 762, L.R.A.1915C, 903.

[19] Helvering v. Stockholms Enskilda Bank, 293 U.S. 84, 92, 55 S.Ct. 50, 54, 79 L.Ed. 211.

ed when "unrelated to reality".[20] Certainly the ghostly fiction of the suit against the Collector as "personal" has little or no utility today; devised to do justice to the citizen, it should not be employed as an instrument of unfairness directed against him. So to employ it, is to do not justice, but injustice, according to law. We have here an instance of what Mr. Justice Holmes [21] called "a conflict between logic and common sense—the one striving to carry out fictions to consistent results, the other restraining and at last overcoming that effort when the results became too manifestly unjust".[22] We may take pride that the judicial process in the United States has moved far in the direction of common sense and more substantial justice since the early years of the last century when Bowen said that the English courts "seemed constantly occupied in the discussion of the merest legal conundrums which bore no relation to the merits of any controversies except those of pedants".[23] The fiction which we are here considering has become one of those remnants of legal pedantry which occasion public reproach. To perpetuate such traps for the unwary litigant is not worthy of a mature judicial system. In most instances, to be sure, changes in a settled legal rule should be left to the legislature. When, however, a rule is not statutory, but a rule of judiciary law, and when no person will be injured by its alteration but, on the contrary, the modification will plainly serve the ends of justice to our citizens, it would seem appropriate that (especially when, as now, the time of the national legislature is fully occupied with matters of the gravest concern) the courts themselves should do the needful. Lord Mansfield once wrote to his friend, the actor, Garrick, that "a judge on the bench is now and then in your whimsical situation between tragedy and comedy; inclination drawing one way, and a long string of precedents the other".[24] In such circumstances, a court should hesitate before ignoring precedents. But the posture of the courts in this matter is not that described by Mansfield; the pertinent precedents the Supreme Court has seemingly, in substance, already repudiated, giving them, of recent days, what, at most, appears to be a perfunctory acknowledgment, as if addressed to a once valued but now superannuated aide.

■ Moreover, even if the fiction is still sufficiently alive to function in a limited way, vis-à-vis res judicata, that does not at all mean that it has effect when, as here, the very different question arises of "relation back" by amendment of pleadings. The rule in the federal courts as to "relation back" is exceedingly liberal; and, for purposes of that rule, the authorities as to res judicata are not controlling. In United States v. Memphis Cotton Oil Co., 288 U.S. 62, 67, 68, 53 S.Ct. 278, 280, 77 L.Ed. 619, the court said: "A 'cause of action' may mean one thing for one purpose and something different for another. It may mean one thing when the question is whether it is good upon demurrer, and something different when there is a question of the amendment of a pleading or of the application of the principle of res judicata."[25] And the court, in reviewing earlier cases, also said, "Thus, in Missouri, Kansas & Texas R. Co. v. Wulf, 226 U.S. 570, 33 S.Ct. 135, 57 L.Ed. 355, Ann.Cas.1914B, 134, plaintiff suing in her individual capacity under a Kansas statute for her son's death was allowed to amend to sue as administratrix under the Federal Employers' Liability Act (45 U.S.C.A. §§ 51-59) after the statute of limitations would have barred another action".

Here, as in the Wulf case (thus cited with approval), it is essential to give such

---

[20] Curry v. McCanless, 307 U.S. 357, 374, 59 S.Ct. 900, 909, 83 L.Ed. 1339, 123 A.L.R. 162.

[21] Agency, Collected Legal Papers (1920) 81, 101; cf. The Eugene F. Moran, 212 U.S. 466, 474, 29 S.Ct. 339, 53 L.Ed. 600.

[22] To pacify the logicians, that statement should be slightly altered: the vice is not in the logic but in such obsession with logic as to cause blindness with respect to the major premise.

[23] "At a moment when the pecuniary enterprises of the kingdom were covering the world, when railways at home and steam upon the seas were creating everywhere new centres of industrial and commercial life, the common law courts of the realm seemed constantly occupied in the discussion of the merest legal conundrums which bore no relation to the merits of any controversies except those of pedants, and in the direction of a machinery that belonged to the past." Bowen, L. J. quoted in Holdsworth, History of English Law, I (1922) 645.

[24] 12 Holdsworth, op. cit. 555.

[25] See Clark, Code Pleading, 505, cited with approval in United States v. Memphis Cotton Oil Co., supra, 288 U.S. at pages 68, 69, 53 S.Ct. 218, 77 L.Ed. 619.

notice of "the specified conduct complained of", but when it is given, "the reasons for the statute of limitations do not exist". New York Central & H. R. R. Co. v. Kinney, 260 U.S. 340, 346, 43 S.Ct. 122, 67 L.Ed. 294, quoted with approval in the Memphis Cotton Oil case, 288 U.S. at page 69, 53 S.Ct. at page 281, 77 L.Ed. 619.

It is urged, however, that appellee is barred on the ground that, if she had originally named the United States as defendant, she could not have maintained her suit, as the amount which she then demanded exceeded the so-called "jurisdictional" limit of $10,000 fixed by the Tucker Act[26] in such suits when brought in the District Court. The argument is advanced that, in such circumstances, as the court would have been without "jurisdiction", the doctrine of "relation back" is inapplicable. At first glance, that argument runs foul of the Wulf case, supra; there, recovery in the action, as originally begun, could not have been had, and, absent an amendment, the suit would probably have been dismissed on demurrer for want of "jurisdiction", because the ad damnum was $40,000, while the Kansas statute limited recovery to $10,000; yet an amendment stating allegations which, for the first time, seemed to confer "jurisdiction"—since there was no such limit as to amount under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq.—was approved by the Supreme Court[27], although, if the amendment had been treated as the commencement of a new suit, the action would have been foreclosed by the statute of limitations. In other words, although in the Wulf case, the suit as begun seemingly gave the court no "jurisdiction", that fact did not make inefficacious an amendment, filed after the statute had run, which first conferred such "jurisdiction". It is also to be noted that if, in the Wulf case, the suit, as originally begun, had gone to judgment for the defendant on demurrer, because of the excessive amount demanded by the plaintiff under the Kansas statute, such a judgment could not have been pleaded as res judicata in a suit subsequently begun by the plaintiff under the federal statute; yet the amendment effectively related back.

The court in the Wulf case, 226 U.S. at page 576, 33 S.Ct. 135, 57 L.Ed. 355, Ann. Cas.1914B, 134, stressed the fact that the plaintiff had applied to the trial court and was allowed to file the amendment.[28] And so as to appellee in the instant case: Our order remanding the case on the prior appeal was interpreted as an invitation to amend the pleadings, after the statute had run, precisely as appellee did, by reducing the claim to $10,000 and substituting the United States as defendant. It is perhaps arguable that in the Wulf case the limitation of the amount recoverable under the Kansas wrongful death statute was not a "jurisdictional" element while it is under the Tucker Act. But (apart from an aspect of the matter we shall note below) that is a dubious distinction, for the court in the Wulf case had no power to entertain a suit at common law for wrongful death and could be said not to have jurisdiction of the subject matter except pursuant to the Kansas statute, which created no cause of action of a claim if it exceeded $10,000.[29]

■ However, there is a factor here which was not present in the Wulf case: There the Kansas statute created a cause of action against a private person. But here the defendant is a sovereign government; unless by statute it consents, a suit against it is a nullity. And there are many cases in which the Supreme Court has most narrowly construed statutes conferring such consents. Thus, in Finn v. United States, 123 U.S. 227, 8 S.Ct. 82, 31 L.Ed. 128, it was held that, in a suit brought against the United States in the Court of Claims, the period of limitation, fixed in the act consenting to such suits, operated by its own force as a bar; it constituted an exception to the usual rule that the statute of limitations is a defense which must be set up in order to be availed of; it was, therefore, the duty of the Court of Claims to dismiss such a suit of its own motion when it appeared that the claim was barred by limitations, although the statute of limitations may not have been pleaded; the reason

---

[26] 28 U.S.C.A. § 41(20).

[27] See a subsequent discussion of the case in New York Cent. & H. R. R. Co. v. Kinney, 260 U.S. 340, at page 345, 43 S.Ct. 122, 67 L.Ed. 294, 1922.

[28] It thus distinguished its earlier decision in American Railroad Co. v. Birch, 224 U.S. 547, 32 S.Ct. 603, 56 L.Ed. 879.

[29] There is no unanimity in the State courts as to related questions under state statutes; cf. Davis v. Jerrell, 25 Ala.App. 524, 149 So. 720, 1933, and McConnell v. Williams Steamship Co., 239 App.Div. 393, 267 N.Y.S. 554, 1933, with Spring v. Barr, 9 La.App. 732, 120 So. 256, 1929, and Harris v. Roth, 143 A. 557, 6 N.J.Misc. 1006, 1928.

given for that unusual ruling was that a statute granting a waiver by the sovereign of its immunity must be narrowly and literally construed against the citizen. That decision, since cited with approval, warns us to regard the limitation of amount in the Tucker Act as a condition with which the complaining citizen must rigidly comply and one upon which the courts, of their own motion, must insist. True, it has been held that, where a plaintiff, in a suit in the federal courts, fails to allege diversity of citizenship—which is "jurisdictional"[30]—he may amend, after the statute has run, so as to supply the missing allegation if it correctly states the actual facts. Bison State Bank v. Billington, 5 Cir., 228 F. 116, 1915. While the Supreme Court has never so held, such a ruling seems consonant with its decisions that a judgment by a federal District Court, where the record is silent as to federal "jurisdictional" facts (such as diversity of citizenship or that the claim is not less than the minimum amount), is not void on collateral attack.[31] It has also been held that, if a plaintiff has a claim against the United States for more than $10,000, he may, if he waives the balance when he begins the suit, maintain an action against the United States for that limited amount in the District Court under the Tucker Act. Hill v. United States, C.C.Mass., 40 F. 441, 1889; Hedger Co. v. United States, D.C.N.Y., 42 F.2d 553, 1930. It would seem to follow from the foregoing that, if in a suit under the Tucker Act, the judgment were for $10,000 or less, but the pleadings showed a demand for, say, $12,000, the judgment nevertheless would not be subject to collateral attack. It might be argued, accordingly, that, if a suit were begun against the United States in the District Court for more than $10,000, an amendment, even after the statute had run, reducing the claim so as to bring it within the permitted figure, would "relate back" and save the action, because the court had jurisdiction of the subject matter, even if the cause of action was improperly pleaded originally; such a case seems not unlike one where the plaintiff neglects to allege diversity of citizenship and is permitted to do so after the statute has run. Bison State

Bank v. Billington, supra. The foregoing chain of reasoning, if correct, might serve to save the present action.

But in the supposed case, and here, the difficulty is, it would seem, more grave than a failure, in the ordinary case, to allege "jurisdictional" facts; it is something apparently regarded by the Supreme Court as more serious, i. e., as a failure to comply with a condition of the sovereign's waiving its immunity from suit. The seriousness of such a failure is shown by Mellon v. Arkansas Land & Lumber Co., 275 U.S. 460, 48 S.Ct. 150, 151, 72 L.Ed. 372. There plaintiff was injured by the conduct of two railroads when they were being operated under federal control. That control terminated before suit was brought, but, by statute, the United States consented to be sued after such termination, provided the suit were brought against the agent designated by the President for such purpose within the period of limitation prescribed by state or federal statute. Plaintiff brought his action against Payne, who had been Director General, alleging that he was the designated agent. However, prior to the time when suit was begun, Payne had resigned, and a successor, Davis, was then the designated agent. After the applicable statute of limitations had run, plaintiff amended, making Davis the defendant. The Supreme Court held this could not be done, and that the suit must be dismissed because "the substitution of Davis, the designated Agent, was not the correction of an error in the name of the defendant, but the bringing in of a different defendant * * *"; "the United States had not consented to being sued after the termination of federal control except as provided by section 206 of the Transportation Act [49 U.S.C.A. § 74], that is, by a suit brought against the Agent designated by the President for such purpose, within the period of limitation prescribed by the State statute. This plainly meant that the suit must be brought within the period of limitation against the person who was the designated Agent and alone had authority to represent the Government. The bringing of the suit against Payne, who was not the designated Agent, was not

---

[30] In the sense that the court should dismiss such a suit on its own motion, and that the defect cannot be waived by the parties.

[31] Cf. Chicot County Drainage District v. Baxter State Bank, 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329; Stoll v. Gottlieb, 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104; as to suits against a collector, cf. Retzer v. Wood, 109 U.S. 185, 188, 3 S.Ct. 164, 27 L.Ed. 900; but see Jackson v. Irving Trust Co., 311 U.S. 494, 61 S.Ct. 326, 85 L.Ed. 297, as to suits against the United States.

a compliance with this requirement and brought no representative of the Government before the court". Cf. Davis v. L. L. Cohen Co., 268 U.S. 638, 45 S.Ct. 633, 69 L.Ed. 1129, and Mellon v. Weiss, 270 U. S. 565, 46 S.Ct. 378, 70 L.Ed. 736.

Such cases might conceivably be differentiated from the Wulf case, supra, on the ground that in that case the defect was that the plaintiff had sued in the wrong capacity—that being a remediable error—whereas the failure to sue a *defendant* in his proper capacity is irremediable after the statute has run. Cf. Fitzpatrick v. Pitcairn, 371 Ill. 203, 20 N.E.2d 280; Coventry v. Barrington, 117 N.J.L. 217, 187 A. 348; Holliday v. Mangels, D.C., 33 F.Supp. 471; Toledo Edison Co. v. McMaken, 6 Cir., 103 F.2d 72. But Boyd v. United States Mortgage & Trust Co., 187 N.Y. 262, 270, 79 N.E. 999, 9 L.R.A.,N.S., 399, 116 Am.St.Rep. 599, 10 Ann.Cas. 146, holds to the contrary; it is a well-reasoned case which is in line with the views expressed in the Wulf and Memphis Cotton Oil cases. In the Boyd case, however, when the suit began, there was service on the defendant, although in a wrong capacity, whereas in the Mellon case there was, when suit was instituted, no such service on the United States, because the person served was then no longer its agent; the Mellon case might be assimilated to those cases where a new defendant, on new service, is brought in too late.[32] If it be argued that the same was true in the instant case, we are brought back to the problem we first discussed—whether the suit originally begun against the Collector was a suit against the United States. If it was, then the amendment did not require new service and brought in no new defendant. The instant case, so considered, would turn on the vitality of the fiction that a suit against the Collector is personal. That fiction might perhaps be abandoned for purposes of such a case as this; but cf. Toledo Edison Co. v. McMaken, supra.

The difficulty here, however, is not thus limited in scope. The Mellon decision did not seem to turn on the point that the service was of a character which would be held defective in a suit against an ordinary defendant, but rather on the point that the citizen had not literally complied with a condition attached to the sovereign's consent to be sued. In United States v. Davis, 56 App.D.C. 46, 8 F.2d 907, cited with approval in the Mellon case, it was held that a judgment obtained on service against one who had ceased to be Director General at the time when suit was brought, was void and subject to collateral attack, since those facts were apparent upon the face of the record; the court said (56 App. D.C. 46, 8 F.2d at page 909) that "where the congressional consent specifies the time within which such actions may be brought, the provision operates as a condition of liability, not merely as a period of limitation." Cf. Davidson v. Payne, 8 Cir., 289 F. 69. That rationale accords with Finn v. United States, supra, and with other utterances of the Supreme Court: In Eastern Transportation Co. v. United States, 272 U.S. 675, 686, 47 S.Ct. 289, 291, 71 L. Ed. 472, it said, "The sovereignty of the United States raises a presumption against its suability, unless it is clearly shown; nor should a court enlarge its liability to suit * * * beyond what the language requires". See, also, Minnesota v. United States, 305 U.S. 382, 388, 59 S.Ct. 292, 83 L.Ed. 235. In the recent case of United States v. Sherwood, 61 S.Ct. 767, 769, 85 L.Ed. ——, the court said: "The United States, as sovereign, is immune from suit save as it consents to be sued, * * * and the terms of its consent to be sued define that court's jurisdiction to entertain the suit. * * * The section must be interpreted in the light of its function in giving consent of the Government to be sued, which consent, since it is a relinquishment of a sovereign immunity, must be strictly interpreted". The court (in there deciding that the District Courts under the Tucker Act, like the Court of Claims, are "without jurisdiction" to entertain a suit which involves, as a prerequisite to recovery against the United States, a determination of claimant's rights against private persons) said: "The matter is not one of procedure but of jurisdiction whose limits are marked by the Government's consent to be sued". And it spoke of "construing the statutory language with that conservatism which is appropriate in the case of a waiver of sovereign immunity * * *." See, also, Price v. United States, 174 U.S. 373, 375, 19 S. Ct. 765, 43 L.Ed. 1011; United States v. Shaw, 309 U.S. 495, 501, 60 S.Ct. 659, 84 L.Ed. 888; United States v. United States Fidelity Co., 309 U.S. 506, 514, 60 S.Ct. 653, 84 L.Ed. 894.

---

[32] Cf. Hackner v. Guaranty Trust Co., 2 Cir., 117 F.2d 95, 99.

To be sure, the Supreme Court, with particular reference to a suit against a Collector, seemed, in Moore Ice Cream Co. v. Rose, supra, to have deviated from its attitude of extremely strict construction of statutes waiving the sovereign's immunity. There (in rejecting a narrow construction of the amendment to the statute eliminating the condition to suit for recovery of taxes that they must have been paid under protest) Mr. Justice Cardozo, speaking for the court, said (289 U.S. 377–379, 53 S.Ct. 622, 77 L.Ed. 1265): "Even in suits against the collector, the United States was almost always the genuine defendant; the liability of the nominal defendant being formal rather than substantial. In this situation the government was unjustly enriched at the expense of the taxpayer when it held on to moneys that had been illegally collected, whether with protest or without. So at least the lawmakers believed, and gave expression to that belief, not only in the statute, but in Congressional reports. * * * The amendment was designed to right an ancient wrong. It did not draw a distinction between suits against the body politic and suits against a public officer who was to be paid out of the public purse. It put them in a single class, and made them subject to a common rule. *A high-minded Government renounced an advantage that was felt to be ignoble, and set up a new standard of equity and conscience.* There was no thought to discriminate between payments made and those to come. *A fine sense of honor had brought the statute into being. We are to read it in a kindred spirit*". (Italics ours.)

We face the fact, however, that when a conflict arose between a decision which followed the generous spirit of Moore Ice Cream Co. v. Rose, supra, and one which applied a more rigid canon of statutory construction, the Supreme Court approved the latter decision, and thus indicated that the liberality of the Moore Ice Cream case must be cautiously applied. [33] We do not, therefore, feel free to hold that appellant is not barred by the statute of limitations.

Were we thus free, we would do so, for such a decision in favor of the taxpayer would not involve any dangerous ignoring of precedents. "If the Courts were to apply to the decision of substantially the same case one principle today and another tomorrow, men would lose rights they already possessed," wrote Dicey. [34] That statement succinctly summarizes those arguments for adhering to precedents which command the respect of all intelligent lawyers, and which persuade courts to be reluctant to revise retrospectively an established rule of judiciary law, even when it is not all that it should be. But such an argument loses its meaning if advanced against the rejection of a precedent, not born of any statute, when no man will lose any pre-existing rights because of that change, the only consequences of which will be to injure the vested interest of a few lawyers in their acquired knowledge of a formulation that no longer has any reasonable excuse for existence and to deprive the government of funds which unjustly enrich it. [35] To stand by former decisions, now regarded as unfortunate, may be appropriate when men who may have acted upon them will suffer loss, if they be altered; to do so when, demonstrably, there can be no such reliance, is to indulge in mere legal aestheticism. The judiciary owes the government, of which it is a branch, no obligation to keep alive a rule whose only function is to enable that government to retain moneys which it has unlawfully taken from its citizens. There are profound reasons why, generally, the courts should conservatively interpret statutes relaxing the government's

---

[33] Lowe Bros. Co. v. United States, 304 U.S. 302, 58 S.Ct. 896, 82 L.Ed. 1362, affirming, 6 Cir., 92 F.2d 905, 1937. See United States v. Piedmont Mfg. Co., 4 Cir., 89 F.2d 296, 1937; cf. Routzahn v. Reeves Bros. Co., 6 Cir., 59 F.2d 915, 1932, where recovery was denied because the funds had not been paid to the Collector sued, who was successor to the Collector in office when the overpayment was made.

[34] Law and Opinion in England During the Nineteenth Century, 2d Ed. 1914, 367.

[35] To respect precedents to the point of refusing to alter such a rule is to make plausible Swift's excessive condemnation of lawyerdom: "It is a maxim among lawyers", said his Gulliver, "that whatever has been done before may legally be done again, and they therefore take special care to record all the decisions formerly made against common justice and the general reason of mankind. These, under the name of precedents, they produce as authorities to justify the most iniquitous opinions, and the judges never fail of directing accordingly."

immunity from liability for acts of its officers. That insulation is not, in this country, a derivative of the maxim that "the King can do no wrong" [36], but is founded upon wise considerations of policy (United States v. Shaw, supra) which dictate that the federal government should determine for itself which acts of its officials shall make it legally liable [37]. Accordingly, an intention to strip off wide portions of that insulation should not lightly be imputed to Congress. As, however, Congress is the legislative branch of a democratic government which does not claim to be the equivalent of a despotic monarch who can do no wrong, its intention, as it relates to a citizen in the peculiarly unfortunate plight of the taxpayer in this case [38], might be interpreted as other than excessively stingy. [39] But, for reasons above indicated, such an interpretation must be left to the Supreme Court.

■ Our mandate on the earlier appeal was interpreted by the trial judge as permitting the amendment so as to save taxpayer's cause of action. Assuming that that implication of the mandate was the law of the case, yet, if it was seriously incorrect, it does not bind us. Cf. Messinger v. Anderson, 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152; Cadillac Motor Car Co. v. Johnson, 2 Cir., 221 F. 801, L.R.A.1915E, 287, Ann.Cas.1917E, 581; Cf. Riehle v. Margolies, 279 U.S. 218, 220 et seq., 49 S.Ct. 310, 73 L.Ed. 669. [40]

■ For the same reason, it is arguable that we are now at liberty to rectify any error in our earlier decision and that we erred in holding on the prior appeal that the suit, as begun against the Col-

---

[36] Langford v. United States, 101 U.S. 341, 342, 25 L.Ed. 1010; cf. United States v. Lee, supra; Chisholm v. Georgia, 2 Dall. 419, 471, 1 L.Ed. 440.

For the history of that maxim, see Holdsworth, History of English Law, II, 3d Ed. 1923, 252–256; II, 464–469; IV (1924) 200–217; VI (1924) 3–122, 267; X (1938) 651–654, and Borchard's excellent study, Government Responsibility in Tort, 34 Yale L.J. (1924), I, 129, 229; 36 Yale L.J. (1926) I, 757, 1039.

[37] As to the States, there was, of course, no immunity prior to the enactment of the 11th Amendment. Chisholm v. Georgia, supra.

Borchard, supra, appears incorrectly to interpret Mr. Justice Holmes' position in The Western Maid, 257 U.S. 419, 433, 42 S.Ct. 159, 66 L.Ed. 299, which must be read in the light of Holmes' remarks elsewhere as to the nature of legal rights; see Holmes, The Path of the Law, Collected Legal Papers (1921) 167; Book Notice, 6 Am.L.Rev. (1872) 723, 724; Codes and the Arrangement of the Law (1870) 5 Am.L.Rev. 1, 5; Holmes, The Common Law (1881) I, 214; Natural Law in Collected Legal Papers (1920) 310, 313; cf. Frank, Mr. Justice Holmes and Non-Euclidean Legal Thinking, 17 Cornell Q. (1932) 568.

Holmes' position in The Western Maid, supra, was that, no matter what may be the history or justification for or moral objections to the government's immunity from suit, to the extent that it exists, no one has a *legal* right against the government and it has committed no legal wrong. Cf. Holmes, His Book Notices and Uncollected Letters and Papers (1936), edited by Shriver, p. 204.

It is idle chatter to speak of a legal wrong for which there is no legal redress; a so-called legal right without a legal remedy is—as the taxpayer in the case before us knows to his sorrow—of no practical value, being but a shabby mythical entity like the "grin without a cat" which Lewis Carroll's Alice, justifiably, could not understand, for it is comprehensible only to those who dwell in Wonderland. In the world of common sense, all that Borchard can mean is that there may be moral indignation at the want of a legal remedy; if that moral indignation influences Congress to grant such a remedy, then, for the first time, a legal right will exist, but the moral indignation which may be a causative factor in the creation of that legal right should not be confused with it.

[38] His grievance is of a "recognized character" and, were there consent to be sued, a "case or controversy" would exist. Muskrat v. United States; Perkins v. Lukens Steel Co.; Alabama Power Co. v. Ickes, and related cases cited supra.

[39] Cf. L. Hand, J., in Heil v. United States, D.C., 273 F. 729, 731.

[40] That the Supreme Court denied certiorari with respect to our decision on the earlier appeal did not, it would seem, make the implication of our remanding the case the law of the case as established by the Supreme Court so that we are not at liberty to change it now. Cf. Hamilton-Brown Shoe Co. v. Wolf Brothers & Co., 240 U.S. 251, 258, 259, 36 S.Ct. 269, 60 L.Ed. 629, 1916; Simmons Co. v. Grier Bros. Co., 258 U.S. 82, 91, 42 S.Ct. 196, 66 L.Ed. 475, 1922.

lector, could not be maintained, since that point (as appears from the record on the first appeal) was not made on behalf of the Collector in the District Court, having been first raised in this court on the first appeal after the statute of limitations had barred a claim against the United States. [41] But, apart from the fact that appellee, by her subsequent amendment, after certiorari was denied, acquiesced in that ruling (which might not prevent rectification now), there is this difficulty: The error was of so serious a character that it could be first raised on appeal [42], especially in litigation which, in substance, must be founded upon the government's consent. [43]

It may be that the particular facts of this case (i. e. that the taxpayer was misled by the decisions as they stood in 1933 when he began his action, into believing he could maintain his suit against the Collector, and the fact that the defect in his action was first raised in this court on the earlier appeal when the statute had already run) may induce the Supreme Court to apply the rule of R. F. C. v. Prudence Group, 311 U.S. 579, 61 S.Ct. 331, 333, 85 L.Ed. 364,[44] and to exercise its "broad power to make such disposition of the case as justice requires" so as to hold that she may maintain her suit, the statute of limitations notwithstanding.

As we are constrained to decide against appellee, because of the running of the statute of limitations, it is unnecessary for us to consider whether or not the District Court, on the evidence before it on the second trial, correctly held that the claim for refund was timely filed with the Commissioner.

The judgment of the District Court is reversed.

---

[41] Cf. Retzer v. Wood, 109 U.S. 185, 3 S.Ct. 164, 27 L.Ed. 900, where it was held that, in a suit against a Collector, the bar of the statute of limitations cannot be considered if not pleaded in the trial court. Finn v. United States, 123 U.S. 227, 8 S.Ct. 82, 31 L.Ed. 128, is contra where the suit is directly against the United States.

[42] United States v. Atkinson, 297 U.S. 157, 56 S.Ct. 391, 80 L.Ed. 555; Wiborg v. United States, 163 U.S. 632, 658, 16 S.Ct. 1127, 41 L.Ed. 289; cf. Brasfield v. United States, 272 U.S. 448, 47 S.Ct. 135, 71 L.Ed. 345; New York Central R. Co. v. Johnson, 279 U.S. 310, 49 S.Ct. 300, 417, 73 L.Ed. 706.

[43] Compare United States v. United States Fidelity & Guaranty Co., 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894, with Jackson v. Irving Trust Co., 311 U.S. 494, 61 S.Ct. 326, 85 L.Ed. 297; in the United States Fidelity case, it was apparent from the face of the claim that the suit was not one as to which immunity had been waived, and the order was held void on collateral attack, the court differentiating such a case involving immunity from Chicot County Drainage District v. Baxter State Bank, 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329; in the Irving Trust case, the complaint alleged facts which, if true, showed a claim of the kind with respect to which immunity had been waived by statute, and the issue of fact thereby raised was decided adversely to the government, with the result that it was held that the court was powerless, years later, to vacate the judgment upon proof that the true facts showed a claim of a kind for which the government was not suable. See, also, Toledo Edison Co. v. McMaken, 6 Cir., 103 F.2d 72, 76.

Of course, to say that, for these purposes, the suit against the Collector, which was before us on the prior appeal, was a suit, in substance, against the United States, involves, pro tanto, a rejection of the fiction that such a suit is "personal".

[44] A majority of the court there held that "the failure to comply with statutory requirements * * * is not necessarily a jurisdictional defect", and that such requirements will be relaxed where a party has been misled by the decisions; two of the justices, concurring, held that "in rare instances" the "broad power to make such disposition of the case as justice requires" should be used to cure "even jurisdictional defects".