Albert **WOLAK**

v.

**UNITED STATES of America et al.**

v.

Walter **PIORKOWSKI.**

**Civ. No. 13041.**

United States District Court,
D. Connecticut.

Nov. 9, 1973.

William Singer, Hartford, Conn., for plaintiff.

Stewart H. Jones, U. S. Atty.; Henry S. Cohn, Asst. U. S. Atty., Hartford, Conn., for defendants.

No appearance made for third-party defendant, Walter Piorkowski.

## MEMORANDUM OF DECISION

BLUMENFELD, Chief Judge.

This case presents the questions whether the United States has made an implied promise to owners of United States Savings Bonds to redeem such bonds only in accordance with pertinent federal regulations, and whether an owner's lack of due care in the safekeeping of United States Savings Bonds necessarily relieves the United States from any liability to such owner for losses resulting from redemption of the bonds and payment therefor to a person other than the owner, which acts of redemption and payment were performed by an agent of the United States in contravention of applicable federal regulations.

### Facts

Plaintiff is an elderly man of Polish descent with little understanding of the English language. Plaintiff contemplated going into business with cross-defendant Walter Piorkowski, and the two

men met with an attorney to discuss this possible venture. This discussion was conducted partially in Polish. At plaintiff and Piorkowski's suggestion a document was drafted which would vest a power of attorney in Piorkowski to manage plaintiff's affairs. On or about April 6, 1961, plaintiff signed an undated, unwitnessed, unnotarized draft of such power of attorney. Soon after April 6, 1961, Piorkowski began making withdrawals from plaintiff's savings account in order to purchase in plaintiff's name a total of $10,800 in face value United States Series E Savings Bonds.[1] Plaintiff informed the president of the bank from which the withdrawals were made and the bonds purchased that he was aware of and had authorized these transactions. Of the $10,800 in bonds, $9,000 were purchased in April, 1961, and of the remainder all but $300 (purchased in January, 1964) were purchased throughout the balance of 1961.

Beginning in June, 1961, Piorkowski began forging plaintiff's name to these bonds and redeeming them for cash paid to Piorkowski personally. Eventually Piorkowski effected the forged redemption of all $10,800 in bonds. All of these redemptions were made by one bank, which was not the bank at which the bonds had been purchased.[2] While plaintiff had signed the draft power of attorney mentioned above, he did not authorize or intend to authorize Piorkowski's redemption of these bonds, nor did he sign any document (other than the draft power of attorney) which might be construed to authorize redemption of the bonds.

By complaint dated on its face September 27, 1967, Piorkowski was sued by plaintiff for damages suffered through various fraudulent acts, including Piorkowski's conversion of plaintiff's savings bonds. Service was made on this complaint on October 4, 1967, and it was made returnable in November, 1967, in the Superior Court for Hartford County, Connecticut. On September 28, 1967, plaintiff made formal demand on the Department of the Treasury for replacement of the forged bonds or payment therefor.[3] Following the Treasury's refusal to meet this demand, plaintiff filed suit in this Court against the United States in March, 1969. The United States subsequently cross-complained against Piorkowski for indemnity should it be held liable to plaintiff, on the basis of Piorkowski's alleged breach of his warranty that he had authority to act as plaintiff's agent. Piorkowski was served but made no appearance before the Court. Trial was to the Court on May 22, 1973.

*Jurisdiction*

██ Plaintiff's original prayer was for $8,000 "damages," which was changed to $20,000 "damages" in his amended complaint after discovery of additional redemptions of forged bonds (see n. 3, *supra*). Plaintiff's increase in his prayer to more than $10,000 would ordinarily place his claim against the United States within the exclusive jurisdiction of the Court of Claims. 28 U.S.

1. The face value of Series E bonds is their value at maturity; the bonds are purchased at a discount and increase in redemption value until they reach their full face value at maturity. All of the bonds in issue were purchased at 75 per cent of their face value and would have matured seven years and nine months from the date of purchase. I refer to the face value of the bonds for convenience, although at the time of their purchase and redemption they were worth considerably less than face value. All the bonds would have long since matured absent their redemption; were plaintiff to present them for redemption today they would be worth their face value plus additional interest, which accrues throughout an extended maturity period of ten years after maturity on Series E bonds of the dates here involved. 31 C.F.R. § 316.8(4).

2. Only the final $300 in bonds—the amount purchased in 1964 rather than 1961—were purchased from the redeeming bank.

3. Plaintiff's initial request for relief extended only to the first $7,000 in bonds redeemed by Piorkowski. The Government's investigation disclosed that an additional $3,800 in bonds had been redeemed upon forged endorsement.

C. § 1491; Myers v. United States, 323 F.2d 580, 583 (9th Cir. 1963); Nehf v. United States, 278 F.Supp. 444, 446 (N.D.Ill.1967). See also United States v. Shaw, 309 U.S. 495, 500–501, 60 S.Ct. 659, 84 L.Ed. 888 (1940). Under the Tucker Act, 28 U.S.C. § 1346(a)(2), this Court has concurrent jurisdiction with the Court of Claims over claims arising under federal statutes, regulations, or contracts against the United States, but only when such claims do not exceed $10,000. It has been held, however, that the district court's Tucker Act jurisdiction is retained if a plaintiff alleging more than $10,000 damages nevertheless waives any right of recovery in excess of $10,000. United States v. Johnson, 153 F.2d 846, 848 (9th Cir. 1946); Perry v. United States, 308 F.Supp. 245, 247 (D.Colo.1970).[4] Throughout this action both parties have treated it as a Tucker Act case, and the Government has not challenged this Court's jurisdiction. In his Pretrial Order, the Magistrate asserted this Court's Tucker Act jurisdiction, and this assertion was not objected to by either party. Accordingly, I find that plaintiff has waived recovery in excess of $10,000.

■■ In claims against the Government, the statute of limitations is part of the Government's consent to suit and cannot be waived. A claim filed after the running of the statute is beyond the jurisdiction of the Court. Thus it is the duty of the Court to consider the statute of limitations even when, as in the instant case, it has not been put in issue by the Government. Finn v. United States, 123 U.S. 227, 232, 8 S.Ct. 82, 31

L.Ed. 128 (1887); Christian Beacon v. United States, 322 F.2d 512, 514 (3rd Cir. 1963); Crown Coat Front Co. v. United States [II], 275 F.Supp. 10, 15 (S.D.N.Y.1967), aff'd 395 F.2d 160 (2d Cir. 1968), cert. denied 393 U.S. 853, 89 S.Ct. 123, 21 L.Ed.2d 122 (1968).

The applicable statute of limitations provides: "Every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a). Whether a plaintiff's pursuit of administrative remedies necessarily tolls the statute in a contract action has proved a troublesome and as yet not conclusively resolved question. It has been held, however, that where "the completion of . . . administrative proceedings [is] contemplated and required by the provisions of the contract," as under the "disputes clause" of the typical Government procurement contract, no right of action in the courts accrues until a final administrative determination of the claim has been made. Crown Coat Front Co. v. United States [I], 386 U.S. 503, 511, 87 S.Ct. 1177, 18 L.Ed.2d 256 (1967).

■ In discussing the merits of plaintiff's claim, infra, I note that pertinent federal regulations are an implied part of the contract between the Government and a purchaser of savings bonds, and hold that the Government has a consequent contractual duty to comply with its regulations in redeeming savings bonds. Since these regulations also provide for administrative relief for owners of lost or stolen bonds, see infra, I here-

4. It was held in Hammond-Knowlton v. United States, 121 F.2d 192, 202–206 (2d Cir. 1941), that waiver of any recovery in excess of $10,000 could not support a district court's Tucker Act jurisdiction of a claim against the United States, when such waiver occurred after the running of the statute of limitations on the claim. In this case, the six year statute of limitations has yet to run. See p. 1111, infra. Moreover, the rationale of Hammond-Knowlton is no longer persuasive. Suits improperly brought in either the district court or the Court of

Claims may now be transferred "in the interests of justice" from one court to the other without the intercession of the statute of limitations. 28 U.S.C. §§ 1406(c), 1506. Thus were plaintiff's Tucker Act waiver of recovery in excess of $10,000 to be deemed in this case to have occurred after the running of the statute of limitations, the harsh result of dismissal reluctantly reached by the court in Hammond-Knowlton would not obtain here. Rather, plaintiff would be entitled to have his case transferred to the Court of Claims.

by hold that such owners have a parallel contractual duty to seek administrative relief from the Government before seeking recovery in court for damages suffered through the Government's breach of its implied promise to comply with its regulations in redeeming savings bonds. In the instant case, the Government denied plaintiff's claim for administrative relief on December 10, 1968, and plaintiff's suit filed in this Court on March 20, 1969, was well within the statute of limitations.

Plaintiff's action is timely, and this Court has jurisdiction over it under 28 U.S.C. § 1346(a)(2).

*Federal Regulations on Redemption of Savings Bonds*

Each Federal Reserve Bank has the power to qualify financial institutions within its jurisdiction as paying agents of United States Savings Bonds. 31 C. F.R. § 321.3. Such paying agents "are authorized to make payments in connection with the redemption of savings bonds and savings notes, but only in accordance with the provisions of this circular, and any memorandum of instructions, guides, notices, etc., issued by the Department of the Treasury relating to such authorization." 31 C.F.R. § 321.2. A paying agent "may make payment of any savings bonds of Series . . . E . . . upon presentation and surrender by the individual whose name is inscribed as the owner or coowner of the security." 31 C.F.R. § 321.8. "An agent is not authorized to pay a bond or note: . . . (b) If the agent does not know or cannot establish the identity of the person requesting payment as the owner of the security . . . ." 31 C.F.R. § 321.10. The Memorandum of Instructions issued to paying agents, see 31 C.F.R. § 321.18, states that its purpose "is to provide (a) information to supplement the regulations contained in the circular, and (b) specific instructions for processing redemption and redemption-exchange transactions." Among these specific instructions are "7. *Examination of security.* Upon its presentation for redemption or for redemption-exchange, each agent should examine the security to establish the following: . . . (iv) It is not presented by anyone acting under a power of attorney." These regulations and instructions for paying agents reflect the regulations setting forth general provisions governing payment and redemption of savings bonds. These general regulations provide that "the owner or a coowner whose name is inscribed on the bond . . . must appear before and establish his identity to an office[r] authorized to certify requests for payment . . . , and in the presence of such officer sign the request for payment in ink . . . . No request signed in behalf of the owner, a coowner, or person entitled to payment by an agent or a person acting under a power of attorney will be recognized by the Treasury Department [with exceptions not pertinent hereto]." 31 C.F.R. § 315.38(c). "Savings bonds are not transferable and are payable only to the owners named thereon, except as specifically provided in these regulations, and then only in the manner and to the extent so provided." 31 C.F.R. § 315.15.

*Implied Promise to Abide by Regulations*

It is well established that "Savings Bonds are issued pursuant to a contract between the purchasers and the United States. The Treasury Regulations constitute a part of that contract." Spicer v. United States, 217 F.Supp. 44, 50 (D.Kan.1963), aff'd 332 F.2d 750 (10th Cir. 1964). "[A]n estate created in Series E bonds is a matter of contract between the United States and the purchaser of the bonds. The bonds are non-transferable." Estate of Curry, 409 F.2d 671, 675 (6th Cir. 1969). See also United States v. Chandler, 410 U.S. 257, 260–262, 93 S.Ct. 880, 882–883, 35 L.Ed. 2d 247, 250–252 (1973); Guldager v. United States, 204 F.2d 487, 488 (6th Cir. 1953). As was said in the analogous context of Liberty Bonds: "Each of said bonds, together with the stat-

utes, Treasury Regulations, and [Treasury] Circulars constitute a valid and binding contract determining the rights of the parties therein. . . . " United States v. Dauphin Deposit Trust Co., 50 F.Supp. 73, 76 (M.D.Pa.1943). The Government there successfully contended "that the regulations promulgated by the Secretary of the Treasury in connection with the Second Liberty Bond Act . . . have the force and effect of law; that the regulations must be read into the contract between the United States and [a purchaser] so as to become a part thereof. . . ." *Ibid.* I think this contention is equally valid in the instant case. The federal regulations governing the manner of redemption of savings bonds constitute terms implied by operation of law in the contract between plaintiff as purchaser of savings bonds and the United States as maker of those bonds. See Rehart v. Clark, 448 F.2d 170, 173 (9th Cir. 1971). See also Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L. Ed. 838 (1943) [federal common law applies in actions on contracts with United States]. When its paying agent redeemed plaintiff's bonds in violation of pertinent federal regulations, the Government incurred liability to plaintiff for the foreseeable damages plaintiff suffered by virtue of this breach of contract. Ramsey v. United States, 101 F. Supp. 353, 356–367, 121 Ct.Cl. 426 (1952), cert. denied 343 U.S. 977, 72 S. Ct. 1072, 96 L.Ed. 1369 (1952); Thompson v. Rector, 83 U.S.App.D.C. 371, 170 F.2d 167, 169 (1948).

### Statutory and Regulatory Provisions for Relief to Owners of Lost or Stolen Savings Bonds

The statutory and regulatory scheme which the Government has adopted for providing relief to owners of lost or stolen savings bonds suggests that the United States has long been aware of its contractual obligations to purchasers of savings bonds. Under former 31 U.S.C. § 738a[5], as in effect until 1971, the Secretary of the Treasury was directed to replace or make payment for savings bonds which were proved to have been lost or stolen. Unlike lost United States securities payable to bearer, which had to be proved destroyed or otherwise no longer the basis for a valid claim on the United States before replacement securi-

5. Former 31 U.S.C. § 738a provided in pertinent part:

"(a) Whenever it is clearly proved to the satisfaction of the Secretary of the Treasury—

. . . . .

"(2) That any interest-bearing security of the United States, identified by number and description, which is not payable to bearer and which has not been so assigned as to become, in effect, payable to bearer, has been lost or stolen, so that it is not held by any person as his own property, or has been wholly or partly destroyed, or so mutilated or defaced as to impair its value to the owner;

the Secretary, upon receipt and approval by him of a bond of indemnity, if and as required by subsection (b) of this section, shall, in the case of a security which has not matured or become redeemable pursuant to a call for redemption, issue a substitute marked "duplicate" and showing the serial number of the original security; or shall, in the case of a security which has matured or become redeemable pursuant to a call for redemption, make payment thereof to the owner, with such in-

terest only as would have been paid had the security been presented when it became due and payable. . . .

"(b) Except as provided in paragraphs (1)–(4) of this subsection, the owner of such lost, stolen, destroyed, mutilated, or defaced security shall file with the Secretary of the Treasury a bond, to indemnify the United States, in such form and amount and with such surety, sureties, or security as the Secretary of the Treasury shall require: *Provided,* . . . That a bond of indemnity shall not be required in any of the following classes of cases, except as provided in paragraph (4) of this subsection:

. . . . .

"(3) If the lost, stolen, destroyed, mutilated, or defaced security is one which by the provisions of law or by the terms of its issue is transferable only by operation of law;

"(4) . . . *Provided, however,* That in any of the foregoing classes of cases the Secretary of the Treasury may require a bond of indemnity if he deems it essential to the public interest."

ties would be issued, savings bonds would be replaced without even a bond of indemnity save when the Secretary deemed a bond of indemnity "essential to the public interest."

### No Change in Applicable Law

In 1971, 31 U.S.C. § 738a was amended to leave the matter of relief available to owners of lost or stolen savings bonds to regulations promulgated by the Secretary of the Treasury.[6] These regulations currently provide in pertinent part:

> "Relief, either by the issue of a substitute bond marked 'Duplicate' or by payment, may be given under [31 U.S.C. § 738a, as amended], for the loss, theft, destruction, mutilation, or defacement of a [savings] bond after receipt by the owner or his representative. In granting relief under the act, the Secretary of the Treasury may require a bond of indemnity in such form and with such surety as may be deemed necessary for the protection of the United States of America. In all cases the bond must be identified and the applicant must submit satisfactory evidence of loss, theft, or destruction, or a satisfactory explanation of the mutilation or defacement." 31 C.F.R. § 315.25.[7]

I doubt, and the Government does not contend, that the 1971 amendment to 31 U.S.C. § 738a which vested the Secretary of the Treasury with ex-

tensive discretion in providing relief for lost or stolen savings bonds was intended to relieve the Government from any pre-existing duty to provide such relief. The 1971 amendment was intended to facilitate the provision of relief for loss of securities payable to bearer, and its legislative history reveals no change of law relative to savings bonds. See 1971 U.S.Code Cong. & Admin.News, p. 1065. In any event, the law applicable to plaintiff's claim is that in effect at the time demand for relief was made on the Government, since " 'a retrospective operation will not be given to a statute which interferes with antecedent rights . . . unless such be "the unequivocal and inflexible import of the terms, and the manifest intention of the legislature." ' " Greene v. United States, 376 U.S. 149, 160, 84 S.Ct. 615, 621, 11 L. Ed.2d 576 (1964).

### Government Contentions

The Government denies any implied contractual duty to abide by its regulations governing redemption of savings bonds, claiming that these regulations were established to ease the Government's administrative burdens, and that plaintiff is a mere incidental beneficiary of these regulations with no right of recovery for damages incurred through their breach. The Government also contends that, if plaintiff has a contractual right of recovery against the Government, he is estopped from asserting it because he clothed Piorkowski in

---

6. 31 U.S.C. § 738a, as amended, currently provides in pertinent part:
 "Under such regulations as he may deem necessary for the administration of this section, the Secretary of the Treasury is authorized to grant relief on account of the loss, theft, destruction, mutilation, or defacement of any security identified by number and description."

7. 31 U.S.C. § 757c(i) provides in pertinent part:
 "Any losses resulting from payments made in connection with the redemption of savings bonds and savings notes shall be replaced out of the fund established by the Government Losses in Shipment Act, as amended, under such regulations as may

be prescribed by the Secretary of the Treasury. The Treasurer of the United States, any Federal Reserve bank, or any qualified paying agent authorized or permitted to make payments in connection with the redemption of such bonds and notes, shall be relieved from liability to the United States for such losses, upon a determination by the Secretary of the Treasury that such losses resulted from no fault or negligence on the part of the Treasurer, the Federal Reserve bank, or the qualified paying agent."
It is thus clear that the Government has anticipated providing relief to owners of lost or stolen savings bonds even when such relief may result ultimately in a loss to the Government.

"apparent authority" to redeem plaintiff's bonds, and because plaintiff made an election of remedies in bringing suit in state court the day before his demand for relief from the Government.

### Redemption Regulations Intended to Benefit Owners

The Government argues that its regulations restricting the transfer of savings bonds and providing for their redemption by owners only, were not intended to benefit the owners of the bonds but were designed to avoid the administrative burden which would be created were the bonds to be readily transferable. The Government offered the self-serving testimony of a Treasury Department official to support this view of the intent of its regulations. The Government's position is supported by neither precedent nor common sense.

Were the Government seriously to desire to avoid the paperwork imposed by successive transfers of registered bonds, it could issue only bonds payable simply to the bearer. Such bonds flow through the market with a liquidity approaching that of currency itself. Cf. Gutekunst v. Continental Ins. Co., 486 F.2d 194 (2d Cir. 1973). With an obligation only to pay the bearer the redemption value of the bond as prescribed by law, the Government is effectively divorced from any administrative duties toward the purchasers and subsequent owners of such bonds. Savings bonds are purposely structured to allow far more careful monitoring of their ownership. No purpose exists for maintaining a governmental interest in the present ownership of savings bonds save as a means of enhancing the attractiveness of the bonds to individual investors. Savings bonds are represented to the public as an extremely "safe" investment. In terms of the full faith and credit of the United States, they are no safer than Treasury bills or other interest-bearing securities of the United States which are payable to bearer. The real safety of savings bonds as an investment is the care which the Government takes to prevent their being redeemed by other than their registered owners, and the relief the Government has undertaken to provide should an unauthorized redemption be effected despite governmental precautions to the contrary. This service and indemnity naturally imposes costs on the Government. The relatively low rate of return of savings bonds vis-à-vis other United States securities passes on these costs to those who choose to invest in savings bonds.

The only prior decision known to me on the purpose of federal regulations governing redemption of savings bonds supports my conclusion that these regulations are intended to benefit investors in savings bonds by safeguarding their investments against loss or theft. In West Philadelphia Fed. S. & L. Assn. v. United States, 256 F.Supp. 538 (E.D. Pa.1966), the plaintiff redeemed certain savings bonds which had actually been endorsed by their rightful owner, but which were brought into the plaintiff's office by another person, who was paid the value of the bonds by the plaintiff. The Government in that case provided the owner of the bonds with substitute bonds, and sought to withhold from moneys owing the plaintiff an amount equal to the money wrongfully paid by the plaintiff, as the Government's paying agent, to the person who had redeemed the original bonds. The Government justified this withholding of funds from the plaintiff on the ground that the plaintiff, in redeeming the original bonds without witnessing the endorsement of the bonds by the owner and without insisting on the presence of the owner, had violated the federal regulations by which it was bound under both these regulations and its contract with the Government to act as its paying agent. In upholding the plaintiff's liability on this basis, the court declared:

> "These regulations and the inscription on the bonds proscribe a paying agent from redeeming Savings Bonds for anyone except the owner. They set forth the specific requirement that the owner appear in person and establish his identity. The patent purpose of these rules is to obviate, as

much as possible, fraud, peculation and other such misconduct in connection with the cashing of these securities. [Para.] . . . The Treasury regulations were promulgated to avoid the very type of situation that occurred in this case, and the plaintiff may not ignore them with impunity." 256 F.Supp. at 540.

*Plaintiff Not Estopped by Purported Power of Attorney*

The Government does not claim that the draft power of attorney signed by Wolak had any actual validity, as between plaintiff and Piorkowski, but does argue that the draft document conferred a sufficient appearance of authority to relieve the Government from liability for its paying agent's wrongful redemption of the bonds, federal regulations notwithstanding.

 Even assuming, *arguendo*, that an intentional execution of a power of attorney valid under local law, specifically authorizing redemption by an agent of savings bonds actually endorsed by an owner, might estop such owner from seeking relief from the Government after the agent's theft of the proceeds of savings bonds redeemed under such a power of attorney, no such estoppel is presented here. The draft power of attorney here in issue contained no specific reference to savings bonds; it vested Piorkowski merely with a general power "to sell, assign, transfer, endorse, and deliver all stocks, bonds, promissory notes, or other choses in action or evidence of indebtedness owned by me." I have found as a fact that plaintiff did not intend by this draft power of attorney or otherwise to authorize Piorkowski to redeem savings bonds; thus plaintiff is not estopped from asserting his claim against the Government by any prior inconsistent affirmative action. The Government's alleged estoppel, if it exists, must be premised exclusively on plaintiff's lack

of care in giving Piorkowski apparent authority to act in excess of his actual authority.

 The Government has provided no case law for its estoppel theory, but presumably invokes the "general rule [that] where the true owner of property holds out another, or allows him to appear as the owner of, or as having full power of disposition over, the property, and innocent third persons are thus led into dealing with such apparent owner or person having such apparent power of disposition, they will be protected. . . . [Para.] In such cases the rights of such third persons do not depend on the actual title or authority of the party with whom they deal directly, but are derived from the action of the real owner, which precludes him from disputing as against them the existence of the title or power which, through negligence or mistaken confidence, he caused or allowed to appear to be vested in the party making the conveyance." 31 C.J.S. Estoppel § 104, pp. 531–532 (1964). However, this "rule as to estoppel of the party conferring ostensible ownership or authority on another protects only those who in dealing with the apparent owner act in good faith with ordinary caution and prudence, without actual or constructive knowledge of the true owner's rights. The person alleging the estoppel must have acted and parted with value on the faith of such apparent ownership or authority so that he will be the loser if the appearances to which he trusted are real." 31 C.J.S. Estoppel § 106, p. 541 (1964).

The Government produced at trial no probative evidence of its paying agent's reliance on the draft power of attorney in allowing Piorkowski to redeem plaintiff's bonds. The Government did produce a secret service agent who stated that Piorkowski admitted signing plaintiff's name to the bonds and cashing them.[8] The agent questioned Piorkow-

8. It appears that this admission directly pertained only to the first $7,000 in forged bonds, which were the subject of the Government's investigation at the time of the

Piorkowski interview. The other forged bonds did not come to light until later. See n. 3, *supra*.

ski as to what identification the bank requested. "He said that the bank didn't require any identification when he brought the bonds in; that they apparently knew his face around the bank." The Assistant United States Attorney asked the witness: "Did he refer to a Power of Attorney?" The agent enigmatically replied: "Oh, he insisted that he had the Power of Attorney to sign and cash the bonds." It was never clarified whether Piorkowski thus insisted to the bank or to the witness.

Furthermore, the paying agent failed to use "ordinary caution and prudence" if it did rely on the draft power of attorney. Not only was this draft unspecific in its authorization as to savings bonds, as well as undated and unwitnessed, but also any resulting power of attorney was not competent to authorize the redemption under federal regulations. In assessing whether a paying agent exercised sufficient caution to warrant invocation of the equitable doctrine of estoppel, if is only fair that pertinent federal regulations be used as the standard of due care. If these regulations place too onerous a burden of due care on the Government or its paying agents, the Government has manifest power to revise them. And even absent revision of its regulations, the Government itself has a right of indemnity against a paying agent which by failing to abide by redemption regulations renders the Government liable to claims for relief from owners of lost or stolen savings bonds. West Philadelphia Fed. S. & L. Assn. v. United States, *supra,* 256 F.Supp. 538. See also n. 7, *supra.* I accordingly hold that plaintiff is not estopped by his misplaced trust in Piorkowski from claiming relief from the Government for the loss which resulted both from this misplaced confidence and from the Government's own imputed lack of ordinary caution and prudence in redeeming plaintiff's bonds upon their presentation by Piorkowski.

## *Plaintiff not Estopped by Purported Election of Remedies*

 Under federal law, the essential elements of the equitable doctrine of election of remedies are "(a) the existence of the two remedies; (b) the inconsistency between the two remedies; (c) the choice as to one of the remedies." Henderson Tire & Rubber Co. v. Gregory, 16 F.2d 589, 593 (8th Cir. 1926). "The doctrine stated in its simplest form means that, if a party has two inconsistent remedies on his cause of action and makes choice of one, he is precluded from thereafter pursuing the other." *Ibid.* In the instant case, two separate causes of action are involved. On the one hand, plaintiff has a cause of action against Piorkowski for his conversion of plaintiff's savings bonds and other assets. On the other hand, plaintiff has a cause of action against the Government for breach of contract. The fact that the Government's breach was essential to the success of Piorkowski's conversion of plaintiff's bond does not make one wrong out of two. Even though a judgment on one cause of action might reduce *pro tanto* the judgment on the other, no election of remedies results when "the issues involved in each suit are not the same." Anderson v. Abbott, 321 U.S. 349, 355, 64 S.Ct. 531, 534, 88 L.Ed. 793 (1944). There is no inconsistency of remedies in seeking recovery both from Piorkowski, who defrauded plaintiff, and the Government, which broke its contract with plaintiff. Neither remedy requires plaintiff to prove in one case a material fact which he must disprove in the other case.

 In any event, it is clear that under federal law as well as the law of most states an election of remedies, in order to be irrevocable, must lead to some substantial prejudice on the part of the defendant. Inland Waterways Corp. v. Doyle, 204 F.2d 874, 879 (8th Cir. 1953); Myzel v. Fields, 386 F.2d 718, 741, n. 15 (8th Cir. 1967); Wilkin

v. Shell Oil, 197 F.2d 42 (10th Cir. 1952); North Amer. Graphite Corp. v. Allan, 87 U.S.App.D.C. 154, 184 F.2d 387 (9th Cir. 1950). The mere filing in state court by plaintiff of his action against Piorkowski, which action has since not been pursued, did not prejudice the Government in any way. "Ordinarily the mere institution of a lawsuit asserting a claim based on one theory, or seeking one type of relief, does not constitute a binding election precluding the assertion of alternative or inconsistent claims or remedies in the same or another action. . . . A binding election occurs only where one party pursues a remedy to a point where, in reliance on such action, the other changes his position to his detriment. Thereupon the first party is estopped from pursuing an inconsistent remedy." Twentieth Century-Fox Film Corp. v. National Pub., Inc., 294 F.Supp. 10, 12 (S.D.N.Y.1968). No binding election of remedies has been made by plaintiff in this case.

Judgment may enter for plaintiff against the United States in the amount of $10,000.00, without interest or costs.

So ordered.