**Pasquale DiLUIGI, Plaintiff,**

v.

**Major General Nicholas P. KAFKALAS, Individually and in his capacity as Adjutant General of Pennsylvania, Defendant.**

**Civ. No. 76–1332.**

United States District Court, M. D. Pennsylvania.

Aug. 29, 1977.

As Amended Nov. 7, 1977.

Bruce E. Endy, Philadelphia, Pa., for plaintiff.

David Dart Queen, Asst. U. S. Atty., Harrisburg, Pa., Joe R. Reeder, Office of the Judge Advocate Gen., Washington, D. C., for defendant.

## OPINION

MUIR, District Judge.

DiLuigi filed this complaint alleging that his constitutional rights under the due process clause of the Fifth Amendment of the United States Constitution were violated by the termination of his employment as an electronics mechanic at the Army Aviation Support Facility (AASF), Indiantown Gap, Pennsylvania without adequate notice or a hearing. DiLuigi seeks reinstatement to his position and an award of back pay not in excess of $10,000. On July 7 and July 8, 1977, this case was tried before the undersigned judge without a jury. On July 7, 1977, the Court entered an Order allowing DiLuigi until July 19, 1977 to file a responsive brief to a motion submitted on July 5, 1977 by the Defendant based on the proposition that the Court lacks subject-matter jurisdiction of DiLuigi's claim. DiLuigi submitted his brief on July 21, 1977. The following are the Court's findings of fact, discussion, and conclusions of law:

## I. Findings of Fact.

1. The Plaintiff, Pasquale DiLuigi, first enlisted in the Pennsylvania Army National Guard on November 26, 1974, for a period of one-year. (Undisputed)

2. On October 19, 1975, the Plaintiff extended his military enlistment in the Pennsylvania National Guard for one year. (Undisputed)

3. Again on November 1, 1976, the Plaintiff extended his enlistment in the military, this time for a period of three years. (Undisputed)

4. The three enlistments referred to in the preceding paragraphs were voluntary. (Undisputed)

5. On June 16, 1975, while a member of the Pennsylvania National Guard, the Plaintiff was hired as a National Guard technician on a trial or probationary basis for one year. The Plaintiff thereafter was employed at the Army Aviation Support Facility (AASF), located at Indiantown Gap, Pennsylvania. (Undisputed)

6. The Defendant, Major General Nicholas P. Kafkalas, is the Adjutant General of the Pennsylvania Army National Guard. (Undisputed)

7. The Plaintiff was hired by the AASF as an electronics mechanic pursuant to the authorization set forth in the National Guard Technicians Act of 1968, as amended, 32 U.S.C. § 709(a). (Undisputed)

8. The Plaintiff was aware at the time he was first employed by AASF as a technician that his employment was probationary in nature and the trial period for employment was to last one year.

9. The written instrument initiating the Plaintiff's employment as a probationary technician provided, inter alia, that his employment was "subject to completion of one year trial period commencing on 6–16–75." (Undisputed)

10. Both prior to, during and after the terms of his employment with the AASF, DiLuigi held the military grade of SP4, an enlisted man's position in the Pennsylvania National Guard, until September 1, 1976 when he was promoted to the grade of SP5. Said military grade was appropriate to his civilian technician's job as electronics mechanic.

11. The Facility Commander of the AASF was Lieutenant Colonel, now Colonel, Bobby G. Hanna. (Undisputed)

12. Although Colonel Hanna had no daily supervisory responsibilities with regard to the Plaintiff, he did have occasion to observe Plaintiff's behavior with other individuals.

13. The AASF included approximately 300 employees under Colonel Hanna's command.

14. Reporting to Colonel Hanna, and responsible for the overall maintenance and

supply activities of the AASF, was the Aircraft Maintenance Officer, Captain Paul F. Edgar, Jr. (Undisputed)

15. The Plaintiff was one of over 100 employees under Captain Edgar's command.

16. Although Captain Edgar did not personally supervise the Plaintiff in the performance of the Plaintiff's work on a daily basis, he did supervise Mr. DiLuigi on occasion. (Undisputed)

17. To assist him in his supervisory responsibilities, Captain Edgar had two Aircraft Repair Mechanic Foremen. The senior of these two foremen, Warrant Officer Arthur E. Warren, was directly responsible for supervising the Aircraft Repair Section of the AASF; the subordinate of these two foremen, Sergeant 1st Class Eugene S. Beam, was responsible for supervising the Allied Trades Section of the AASF. These foremen were first level supervisors of all technicians under Captain Edgar's command.

18. Warrant Officer Warren's section had responsibility for overall maintenance of the facility's 93 aircraft. Sergeant Beam's section had responsibility for the maintenance of aircraft components.

19. The Plaintiff worked in Sergeant Beam's section in a smaller unit of about 14 technicians referred to as the Avionics Team. (Undisputed)

20. Effective and efficient maintenance of the AASF's 93 aircraft required close coordination between the two sections within Captain Edgar's command. (Undisputed)

21. Sergeant Beam was the Allied Trade Foreman prior to June 16, 1975, when the Plaintiff began work, until March 26, 1976 when Beam retired. (Undisputed)

22. On August 22, 1975, DiLuigi's supervisor Beam and Captain Edgar were notified that DiLuigi was due a within grade increase from WG–09, Step 1 to WG–09, Step 2. This increase was approved by Colonel Niles and became effective December 21, 1975. As a result of said increase, DiLuigi's salary became $11,814.40 annually.

23. The Technician Personnel Office (TPO) and the Personnel Officer, Colonel Hugh S. Niles, are the office and officer on the staff of the Adjutant General and directly responsible to the Adjutant General for personnel administration and review of all technician employment of the Pennsylvania National Guard. There is no direct daily supervisory relationship between Colonel Niles on the one hand and Colonel Hanna and Captain Edgar on the other. The Personnel Officer does not engage in any daily supervision of technicians such as DiLuigi.

24. During his probationary employment the Plaintiff maintained an acceptable level of work performance. (Undisputed)

25. By order of the Secretary of the Army and Secretary of the Air Force, the Federal Personnel Manual, the Federal Personnel Manual Supplements and the Technician Personnel Manual are the official regulations governing the administration of technician personnel. The National Guard Bureau issues Technician Personnel Pamphlets (TPP) which are the daily working nonmandatory guidelines used by supervisors for technician personnel administration. (Undisputed)

26. Technician Personnel Pamphlet 904 (TPP 904) dated November 28, 1975 and its predecessor dated September 30, 1975 (TPP 902) were available to Captain Edgar, Colonel Hanna, Colonel Niles and the Adjutant General in making personnel decisions relating to DiLuigi and other technicians during the entire period of the Plaintiff's employment.

27. On October 15, 1975, upon the recommendation by fellow technicians to Captain Edgar, DiLuigi was appointed to the AASF Recreation Fund Committee. The Committee is an organization which sponsors or provides monetary assistance for recreational activities and plans such activities for all of the AASF employees. The sole purpose of the Committee is to improve the morale of the AASF employees.

28. On January 30, 1976, upon the recommendation of DiLuigi's first level super-

visor, Beam, Colonel Niles approved a promotion for DiLuigi from Grade 9, Step 2 to Grade 10, Step 3. Said promotion became effective February 1, 1976, and thereafter DiLuigi received a salary at an annual rate of $12,585.00. (Undisputed)

29. The promotion was signed, in the absence of Captain Edgar, by Major Schnellbecher. (Undisputed)

30. This initial "grade" promotion during the probationary period, unlike the "step" increase, is not automatic under applicable regulations; however, as a matter of practice it is usually granted. (Undisputed)

31. During the ninth or tenth month of an employee's probationary period it is required by Technician Personnel Pamphlet 902 that every probationary employee be evaluated and that a recommendation be submitted through supervisory channels on National Guard Bureau (NGB) Form 2, as to whether that employee should be retained beyond his trial period of employment.

32. On March 23, 1976, during the ninth month of Plaintiff's employment, Captain Edgar exhibited to Mr. DiLuigi a copy of his NGB Form 2 (Exhibit P–8) recommending that Mr. DiLuigi be separated from the federal service for the reason shown on an attachment thereto. (Exhibit P–9).

33. The Plaintiff's Flight Facility Commander, Colonel Hanna, personally observed the Plaintiff's conduct involving other people on one occasion.

34. As a member of the Recreation Fund Committee, DiLuigi was assigned the job of looking into the profitability and quality of the food provided by vending machine companies to the AASF.

35. At a meeting of the AASF Recreation Fund Committee, Colonel Hanna and Co Ven Co., the vendor in question, DiLuigi stated with some heat he did not like the vendor's food service and that the food gave him "the shits".

36. Colonel Hanna mildly rebuked the Plaintiff by telling him something to the effect that his agitated and accusatory manner was not helping the discussions with the vending machine representatives.

37. Colonel Hanna appreciated the efforts made by the Plaintiff in exploring the Facility's concession with the vending company, Co Ven Co, as evidenced by the fact that on March 1, 1976, Colonel Hanna, in a meeting, publicly complimented the Plaintiff for said efforts.

38. The meeting on March 23, 1976 between Captain Edgar and Mr. DiLuigi during which Mr. DiLuigi's non-retention was discussed lasted about 30 minutes.

39. During the interim between this March 23, 1976 meeting with Captain Edgar and March 26, 1976, Mr. DiLuigi met with Colonel Hanna on at least four different occasions for the sole purpose of discussing his termination.

40. While some of these meetings were relatively brief, at least two of the meetings, scheduled by appointment, lasted the better part of an hour. (Undisputed)

41. These four meetings were always attended by Colonel Hanna and Mr. DiLuigi. The meetings were also attended variously by Mr. Tom Conway, the Plaintiff's selected representative, Captain Edgar, and on one occasion Warrant Officer Warren.

42. DiLuigi requested the initial meeting with Colonel Hanna. Thereafter, Colonel Hanna asked the Plaintiff to return for another meeting or meetings in order to conclude their discussion and so that Colonel Hanna could inform DiLuigi of his decision.

43. During each of these meetings, Mr. DiLuigi, his representative, Mr. Conway, or both, discussed the recommendation made by Captain Edgar.

44. Mr. Conway was a shop steward of the Association of Civilian Technicians. (Undisputed)

45. The Association of Civilian Technicians is a labor organization representing civilian technicians in the Pennsylvania National Guard. Throughout the course of DiLuigi's employment, no labor agreement between the Union and the Pennsylvania National Guard existed. (Undisputed)

46. On at least one occasion, Mr. DiLuigi asked Colonel Hanna whose decision it was to act upon Captain Edgar's recommendation and whether the incident with the Co Ven Co. representatives would have anything to do with Colonel Hanna's decision.

47. Colonel Hanna informed the Plaintiff that the Co Ven Co. incident would by no means control but that it might affect his (Colonel Hanna's) decision on Captain Edgar's recommendation.

48. Colonel Hanna further informed the Plaintiff that he (Colonel Hanna) had not discussed the Co Ven Co. incident with Captain Edgar prior to the Captain's recommendation on March 23, 1976, and that he did not believe that Captain Edgar was otherwise aware of that incident prior to March 23.

49. Captain Edgar had no official or unofficial relationship with Co Ven Co. before or during Plaintiff's employment as a probationary technician.

50. At the conclusion of the last meeting on March 24, 1976, Colonel Hanna informed the Plaintiff that he would make his decision on Captain Edgar's recommendation on the following day. (Undisputed)

51. At the conclusion of the second of two meetings on March 25, 1976, Colonel Hanna announced his decision to the Plaintiff and his representative, Mr. Conway, that he was going to approve and forward Captain Edgar's recommendation to the Pennsylvania National Guard Technician Personnel Officer, Colonel Niles. (Undisputed)

52. On March 29, 1976, the Plaintiff was given his formal notice that he would be terminated effective April 30, 1976.

53. Although Plaintiff signed on March 23, 1976 a copy of NGB 2, Technician Performance Rating, in which Captain Edgar had recommended his separation from the federal service, he received no copy thereof until Colonel Hanna had signed it under date of March 25, 1976.

54. The Technician Performance Rating Sheet contained the following reason for DiLuigi's proposed termination:

"The Technician's conduct and general character traits are such that retention in Federal service is not recommended."

55. Plaintiff and his representative agreed that during the interim between March 23, 1976 and the effective date of termination, April 30, 1976, Mr. Conway would conduct all administrative inquiries and efforts to overturn the recommendation relating to the Plaintiff's non-retention. (Undisputed)

56. On several occasions Mr. Conway approached the individuals on Mr. DiLuigi's chain of command and on the Pennsylvania National Guard staff regarding Mr. DiLuigi. Pursuant to his agreement with Mr. Conway, Mr. DiLuigi at no time after March 26, 1976, personally disputed or otherwise raised the question of his termination with the Technician Personnel Officers until five days after the termination became effective. (Undisputed)

57. Contained in both TPP 904, as well as the Technician Personnel Manual 700/735, are disciplinary and adverse action regulations.

58. At no time was DiLuigi given a written statement setting forth the facts upon which Captain Edgar and Colonel Hanna based their decision to recommend non-retention.

59. Captain Edgar orally advised Mr. DiLuigi on March 23, 1976 of the facts upon which he based his decision to recommend non-retention.

60. On March 24, 1976, Colonel Hanna orally advised DiLuigi of the facts which he would consider in reaching his decision as to whether to recommend retention or non-retention of DiLuigi.

61. On March 25, 1976, Colonel Hanna orally advised DiLuigi that he was going to recommend DiLuigi's termination from the service.

62. DiLuigi was discourteous to Captain Edgar on several occasions in the presence of other personnel at the base prior to March 23, 1976.

63. Mr. DiLuigi's public statements on at least two occasions included challenges to Captain Edgar's authority.

64. At the meetings between Colonel Hanna and DiLuigi, DiLuigi was given an opportunity to make statements with respect to the reasons theretofore given to him for his termination.

65. Neither the notice of non-retention nor the notice of termination apprised DiLuigi that he had any right to reply to the termination action.

66. The termination notice was as follows:

"1. Under the provisions of paragraph 3–7, Technician Personnel Pamphlet 904, dated 25 May 72, be advised that your Technician employment will be terminated effective 30 April 1976 by reason of Unsatisfactory Performance during trial period.

"2. Your demonstrated ability to cope with certain responsibilities inherent with your position are unacceptable as stated in your probationary trial period appraisal. Further, your ability to grasp and maintain basic fundamentals required of your position do not meet required standards.

"3. Questions relative to above termination may be directed to this office."

## II. Discussion.

DiLuigi contends that this Court possesses subject matter jurisdiction concerning his claim for back pay and reinstatement pursuant to 28 U.S.C. § 1331(a) and 28 U.S.C. § 1346(a)(2)[1] known as the Tucker Act. 28 U.S.C. § 1331(a) is the general federal jurisdiction statute. Because as DiLuigi admits, his suit is against the United States, not against the Defendant in his personal capacity, DiLuigi must point to a specific statute allowing him to sue the United States for monetary damages. 28 U.S.C. § 1346(a)(2) permits a civil action or claim against the United States to be brought in a district court for an amount not exceeding $10,000 pursuant to a claim based upon the constitution or any act of Congress. In his complaint DiLuigi alleged a cause of action in excess of $10,000 and he also sought punitive and exemplary damages in the amount of $100,000. A claim against the United States in excess of $10,000 must be brought in the Court of Claims. 28 U.S.C. § 1491 et seq.

Defendant contends that because DiLuigi seeks damages in excess of $10,000 this Court lacks subject matter jurisdiction and Defendant has filed a motion to dismiss pursuant to F.R.Civ.P. 12(b)(1). The first time that the Defendant asserted any challenge to the jurisdiction of this Court was on July 5, 1977 at the final pre-trial conference. The complaint was filed on October 26, 1976. The Defendant had submitted a motion to dismiss or in the alternative for summary judgment in December, 1976. No excuse exists or has been presented to the Court for the Defendant's last minute presentation of a challenge to this Court's jurisdiction. Because a party can always assert lack of subject matter jurisdiction, the Court can impose no penalty against the Defendant. However, the practice of waiting until the eve of trial to challenge the

---

1. 28 U.S.C. § 1346 reads as follows:

**§ 1346. United States as defendant**

(a) The district courts shall have original jurisdiction, concurrent with the Court of Claims, of:

(1) Any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws;

(2) Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States. . . . .

jurisdiction of this Court cannot be too strongly condemned. Because this contention was presented two days before trial, DiLuigi did not have sufficient time to respond fully before the trial of this case. Consequently, the Court was obligated to try this case and then consider the question of jurisdiction. Such a procedure has a potential to cause a gross waste of judicial time and effort. The United States District Courts are engaged in a serious struggle to prevent litigants from being denied their right to prompt and speedy disposition of their cases because of ever-increasing and onerous caseloads. The conduct of counsel for the Defendant in this case contributes to the creation of a backlog.

■ DiLuigi on the second day of trial expressly waived any claim for damages against the United States in excess of $10,000 and stated that he was making no claim against the Defendant in his personal capacity. In his brief submitted on July 21, 1977, DiLuigi again stated his waiver of any damages in excess of $10,000. (Plaintiff's brief, page 5, Document 52). The Plaintiff may confer jurisdiction upon a district court pursuant to the Tucker Act by waiving any damages in excess of $10,000. *Sutcliffe Storage and Warehouse Company v. United States,* 162 F.2d 849 (1st Cir. 1947); *United States v. Johnson,* 153 F.2d 846 (9th Cir. 1946); *Jones v. United States,* 127 F.Supp. 31 (E.D.N.C.1954); *Wolak v. United States,* 366 F.Supp. 1106 (D.Conn.1973) and *Armstrong and Armstrong, Inc. v. United States,* 356 F.Supp. 514 (E.D.Wash.1973), affirmed, 514 F.2d 402 (9th Cir. 1975). The Defendant in his brief acknowledges DiLuigi can establish jurisdiction in this Court by waiving any damages in excess of $10,000. But the Defendant contends that such a waiver must be set forth in DiLuigi's complaint. The only case cited by the Defendant which supports such a proposition and the only case found by the Court is *McClendon v. Blount,* 452 F.2d 381 (7th Cir. 1971). The statement of the United States Court of Appeals for the Seventh Circuit, in that case, that federal district jurisdiction would be denied where the waiver of the amount in excess of $10,000 was not specifically made in the pleadings is dicta and not essential to the holding of the Court. In addition, no reason for such a rule is put forth by the Court. The requirement that waiver be set forth in the pleadings is more appropriate to the abracadabra system of civil procedure which existed in the United States and England until the 20th Century. Such magic word pleading has, in my view, no place in the federal court system of the United States.

■ Several Courts have permitted a waiver of damages in excess of $10,000 even though a greater amount has been set forth in the pleading. In *United States v. Johnson,* 153 F.2d 846 (9th Cir. 1946), the Plaintiff was permitted during the course of the trial to waive damages in excess of $10,000. In *Wolak v. United States,* 366 F.Supp. 1106 (D.Conn.1973) the Plaintiff amended his original damage claim from $8,000 to $20,000. The Court concluded that the Plaintiff's continued assertion of the Tucker Act as the jurisdictional base for his claim was a waiver of any damages in excess of $10,000. In *Fox v. City of Chicago,* 401 F.Supp. 515, 518 (N.D.Ill.1975), the third party Plaintiffs' persistence in asserting jurisdiction in the United States District Court under the Tucker Act was construed by the Court as a waiver by the third party Plaintiffs of any claim against the third party Defendants which exceeded $10,000. In the present case DiLuigi's continued assertion that his claim is based upon the Tucker Act and his explicit waiver of any damages in excess of $10,000 is sufficient to establish that this Court possesses subject matter jurisdiction of his claim for back pay. Consequently, the Defendant's motion to dismiss will be denied.

DiLuigi maintains that as a Government employee he was entitled to written notice and a hearing before a final decision was made to terminate him. In essence, DiLuigi contends that he was deprived of property without due process of law in violation of the Fifth Amendment. As this Court stated in its Opinion of April 18, 1977, 430 F.Supp. 1098 (M.D.Pa.1977), to determine

whether DiLuigi was deprived of property without due process of law, the Court must first determine the extent of DiLuigi's property interest, if any, in this context. The Court concluded in its April 18, 1977 Opinion that 32 U.S.C. § 709(e)(3) gave DiLuigi an interest in continued employment which was entitled to some constitutional protection. Now the Court must determine whether the procedures afforded DiLuigi prior to his termination met the standards of due process.

■■■ Due process does not mandate inflexible procedures applicable in every situation. *Cafeteria Workers v. McElroy*, (1961) 367 U.S. 886 at 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230. At a minimum, due process requires that deprivation of property be preceded by notice and an opportunity for a hearing appropriate to the situation. *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). To determine what process is due, a determination of the precise nature of the governmental function involved must be made as well as of the private interest that has been affected by governmental action. *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). The Government has an interest in the prompt dismissal of incompetent and disruptive employees. This is especially true when the employee is involved in the national defense as is DiLuigi. The Defendant has not shown how providing DiLuigi with a written notice setting forth in detail the basis for his termination would imperil the efficient operation of the AASF and the national defense. DiLuigi's interest in continued employment entitled him to such notice before any hearing. *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Chung v. Park*, 514 F.2d 382 (3d Cir. 1975), cert. den. 423 U.S. 948, 96 S.Ct. 364, 46 L.Ed.2d 282 (1975); *Cuyahoga County Association for Retarded Children and Adults v. Essex*, 411 F.Supp. 46 (N.D.Ohio, 1976).

■■■ DiLuigi received two written notices concerning the reasons for his termination. The first notice was the Technician Performance Rating which DiLuigi signed on March 23, 1976. He received a copy of the notice on March 25, 1976. In its entirety it stated that DiLuigi's conduct and general character traits were such that retention in the Federal Service was not recommended. The second notice, dated March 26, 1976 and received by DiLuigi on March 29, 1976, informed him that he was being terminated because his demonstrated ability to cope with certain responsibilities inherent in his position was unacceptable and his ability to grasp and maintain basic fundamentals required of his position did not meet required standards. These notices were totally inadequate. They constituted bureaucratic gobbledegook and gave DiLuigi only the vaguest idea of the reasons for his discharge. Without being given a detailed explanation in writing of the basis for his termination, DiLuigi lacked the ability to respond effectively. The meetings which he had with Colonel Hanna, the Commander of the AASF and his meetings with other officers of that facility were meaningless because DiLuigi had no concept of the charges he was attempting to answer. Although Captain Edgar informed DiLuigi orally of the reasons for which he was recommending his termination, Colonel Hanna told DiLuigi on March 24, 1976 that other factors might influence his decision to act upon Edgar's recommendation. The oral notice of the reasons for his termination was indefinite. DiLuigi was placed in the position of never knowing the exact basis for his discharge. The Court need not determine whether the informal meetings between DiLuigi, Colonel Hanna and Captain Edgar constituted a hearing sufficient to satisfy the requirement of due process because the failure to afford adequate written notice prior to the meetings violated the standards of due process required in this factual context. Notice to be adequate must be given sufficiently before any hearing to permit the party being considered for termination an adequate opportunity to prepare a response. *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

The Defendant contends that the appropriate remedy if DiLuigi has been terminated in violation of the Fifth Amendment is a remand to army officials for a new hearing. According to the Defendant, back pay and reinstatement of DiLuigi are not required. In *Skehan v. Board of Trustees of Bloomsburg State College,* 501 F.2d 31 (3d Cir. 1974), vacated on other grounds 421 U.S. 983, 95 S.Ct. 1986, 44 L.Ed.2d 474 (1975), 538 F.2d 53 (3d Cir. 1976), the Court of Appeals stated that a finding of a substantive constitutional violation requires the Court to proceed to fashion a remedy and that reinstatement and an award of back pay were appropriate for an employee who had been terminated in violation of the due process clause. The Defendant contends that the Supreme Court's decision in *Mt. Healthy City School District v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) indicates that the Third Circuit's ruling in *Skehan* was in error. The Defendant has misread the Supreme Court's opinion in *Mt. Healthy School District, supra.* The Supreme Court never reached the issue of an appropriate remedy because it concluded that a constitutional violation had not been established by the Plaintiff and remanded the case to the District Court for further findings of fact. The Court is of the view that back pay and reinstatement to the position he held prior to his termination is an appropriate remedy for the wrong DiLuigi suffered. Any lesser remedy would depreciate the seriousness of the violation of due process which occurred.

5 U.S.C. § 5596[2] expressly authorizes the award of back pay to governmental personnel who have been wrongly terminated. Although DiLuigi is entitled to back pay in excess of $10,000, the Court must reduce the award of back pay to an amount below $10,000 in accordance with DiLuigi's waiver of back pay in excess of $10,000. The Court expresses no opinion as to whether there was cause to terminate DiLuigi. The Army is free to institute new termination procedures as soon as DiLuigi is reinstated as long as they comply with due process.

### III. Conclusions of Law.

1. This Court possesses subject matter jurisdiction of this action.

2. DiLuigi was entitled pursuant to the due process clause of the Fifth Amendment of the United States Constitution to written notice specifying the reasons for his proposed termination.

3. The written notices DiLuigi received on March 25, 1976 and on March 29, 1976 did not adequately inform him of the basis for his termination and did not meet the standards required by the due process clause of the Fifth Amendment of the United States Constitution.

4. An award of back pay to DiLuigi is authorized by 5 U.S.C. § 5596.

5. Reinstatement of DiLuigi to the position he held on March 24, 1976 is an appropriate remedy for the violation of his due process rights under the Constitution.

An appropriate order will be entered.

### ORDER

1. The Clerk of Court shall enter judgment for DiLuigi against the Defendant in the amount of $9,999.99.

2. The Defendant shall reinstate DiLuigi to the position he held on March 24, 1976 within 30 days from the date of this Order.

---

2. 5 U.S.C. § 5596 reads as follows:

(b) An employee of an agency who, on the basis of an administrative determination or a timely appeal, is found by appropriate authority under applicable law or regulation to have undergone an unjustified or unwarranted personnel action that has resulted in the withdrawal or reduction of all or a part of the pay, allowances, or differentials of the employee—

(1) is entitled, on correction of the personnel action, to receive for the period for which the personnel action was in effect an amount equal to all or any part of the pay, allowances, or differentials, as applicable, that the employee normally would have earned during that period if the personnel action had not occurred, less any amounts earned by him through other employment during that period; and  . . ..